Case 95.—ACTIONS BY PEASLEE-GAULBERT COMPANY AND BY LOUISVILLE LEAD AND COLOR COMPANY AGAINST ROCHESTER GERMAN INS. CO. AND OTHERS ON POLICIES OF FIRE INSURANCE.—June 15.

## Rochester German Ins. Co. v. Peaslee-Gaulbert Co.

### National Fire Ins. Co. v. Same.

### Pacific Fire Ins. Co., &c. v. Louisville Lead and Color Co.

Appeal from Jefferson Circuit Court, Common Pleas Branch (3d Division).

UPTON W. MUIR, Judge.

Judgment affirmed as against National Fire Ins. Co. and Pacific Fire Ins. Co. and reversed as to Rochester German Ins. Co.

Fire Insurance—Written Contracts—Ambiguity—Construction—Extrinsic Evidence—Terms—Changed Meaning—Judicial No-

Rochester German Ins. Co. v. Peaslee-Gaulbert Co.

tice—Time—Standard—Custom—Noon—Meaning of—Guide to
Determine—Expiration of Policy—Liability of Insurer.

1. Written Contracts—Ambiguity—Construction—Extrinsic Evidence—The construction of words in a written contract is
for the court generally; if ambiguous the meaning intended
may be gathered by the aid of parol or other extrinsic evidence, or if used in a sense peculiar to some special calling or trade the custom may likewise be shown by parol,
which has given the word its extraordinary meaning in the
case.

2. Terms—Changed Meaning—Judicial Notice—Terms in contracts in which time is the essence are construed according
to the common or general meaning of the words. This is
because they come to be so frequently employed in a different sense from that of their former meaning that the changed
meaning comes to be the common one. Of these changes
the court must take notice as they do, judicially, of all matters
of common knowledge.

3. Time—Standard—Custom—Evidence—Contracts to begin or end
at an hour certain, without naming a standard for reckoning
the hour, must be deemed to have intended the system in
most common use. Or, if more than one standard was in
use at the place where the contract was to be performed,
and as both could not have been intended, it is admissible
to prove the prevailing custom at the place of performance
in the business of which the contract under consideration
partook, that the court might determine which was probably
in the minds of the parties.

4. Noon — Meaning of — Guide to Determine — In determining
whether the word "noon," as used in a written contract of
insurance, meant 12 o'clock standard time, the following guide
should be given to the jury: "If the jury believe from the
evidence that at the time the policy of insurance was issued
there existed in the place where the contract was made a
custom or usage with reference to the meaning of the word
noon, so well settled, uniformly acted upon, and of such continuance as to raise a presumption that plaintiffs and defendants knew of it, and entered into the contract of insurance sued on with reference to it, such usage will govern
the jury in arriving at their conclusions."

5. Insurance—Expiration of Policy—Inevitable loss—Liability of
insurer—If a fire broke out in the insured building before the
policy expired, and continued to burn thereafter till it was
totally destroyed, the loss is one occurring within the insured

Rochester German Ins. Co. v. Peaslee-Gaulbert Co.

period. It is all deemed one event and not severable. A damage begun is damage done where the culmination is the natural and unbroken sequence of the beginning, but where the fire did not break out in the insured building before noon of the day the policy expired, the company is not liable although it was inevitable, at the noon hour, that the building would be destroyed by the fire then raging which had broken out in another building.

GIBSON, MARSHALL & GIBSON, BODLEY, BASKIN & FLEX-NER and A. S. BRANDIES for appellants.

## POINTS AND AUTHORITIES.

1. The usual means of determining time of day when time is referred to in ordinary contracts. (Amer. & Eng. Ency. of Law, vol. 26, p. 10; Henderson v. Reynolds, 84 Ga., 162; Curtis v. Marsh, 3 Hurl. & Norman, 866; Ex parte Parker v. State, Tex. Crim. Reps., 14.)

2. The general, popular and established meaning of the word "noon." (Phoenix Ins. Co. v. Mier, Supreme Court of Ohio; Walker v. Protection Ins. Co., 29 Maine, 320; Gordon v. Cain, 68 L. J. Q. B., 434.)

3. Admissibility of parol evidence and custom and usage. Words are to be understood in their plain and popular meaning. (Greenleaf, sec. 278; Eaton v. Smith, 20 Pick., 150; Brown v. Brown, 8 Met., 573; Paull v. Lewis, 4 Watts Reps., 402; Wilmering v. McGaughey, 30 Iowa, 205.)

(a.) Unless they have acquired a technical or unusual meaning when applied to a particular subject-matter. (Lawson on Usages and Customs, 367.)

(b.) Unless words or terms appear upon the face of the contract to be of uncertain or doubtful meaning. (Sleght v. Rhinelander, 1 Johnson; Blacket v. Ins. Co., 2 Crompton & Jarvis; Cockburn v. Alexander, 6 C. B., 791; Partridge v. Phoenix Mutual Life Ins. Co., 15 Wall., 593.)

(c.) Unless context points out that in order to effect immediate intention of the parties, the terms of the contract should be understood in a sense different from the plain and popular meaning. (Barnard v. Kellogg, 10 Wall., 384; Galena Ins. Co. v. Kupfer, 28 Ills., 286; Doe v. Oxenden, 3 Taunton, 152.)

(d.) If evidence is admissible, it can not expressly or by implication contradict plain terms of the contract. (Jones on Evidence, vol. 2, p. 472; Lombardo v. Case, 45 Barbour, 96; Globe Mill Co. v. Minneapolis Elevator Co., 44 Minn., 153; Barksdale v. Brown, 1 Nott & McChord, 517; Allen v. Dykers, 3 Hills (N. Y.), 593; Barber v. Lambert, 28 Ala., 710.)

Rochester German Ins. Co. v. Peaslee-Gaulbert Co.

4. Cases cited by appellees: Coit v. Ins. Co., 7 Johnson, 385; Brown v. Byrne, 77 Eng. Com. Law, 702; Walls v. Bailey, 49 N. Y., 464; Low v. Lehman, 15 Ohio, 179; Hinton v. Locke, 5 Hill, 439; Grant v. Maddox, 15 M. & W., 737; Astor v. Insurance Co., 7 Cowen, 202; Dana v. Field, 12 N. Y., 40; Jones v. German Ins. Co., 110 Iowa, 75; Finney v. Clay, 2 Bibb., 351.)

5. Against policy of law to permit local usage and custom to change the universal meaning of the word. (Stoever v. Lessee of Whitman, 5 Binney, 216; Barnard v. Kellogg, 10 Wall., 385; Schooner Reeside, 2 Sumner, 567; Harper v. Pound, 10 Indiana, 32; Balton v. Colder; Strong v. Grand Trunk Railway Co., 15 Mich., 206; Paull v. Lewis, 4 Watts Rep., 412; Noble v. Durelle, 3 Term Reports, 271.)

6. Where a policy insures against actual loss during a fixed period, there can be no recovery except for so much of the loss as was actually sustained during that time. Such a policy does not cover perils or danger of loss. (Lockyer v. Offley, 1 Term Reports, 252; Knight v. Faith, 15 A. & E., 649; Howard v. Protective Insurance Co., 7 Ohio, 404; Coit v. Smith, 3. Johnson's Cases, 16; Bill v. Mason, 16 Mass., 313; Peters v. Phoenix Ins. Co., 3 Sergeant & Rawle, 25.)

HUMPHREY, HINES & HUMPHREY and TRABUE, DOOLAN & COX for appellees.

POINTS AND AUTHORITIES.

1. (a.) The rule in Kentucky is that the courts will presume that parties use words in their "popular rather than" their "technical meaning." (Finnie v. Clay, 2 Bibb., 351; Vance v. Marshall, 3 Bibb., 150.)

(b.) Where a word used in a written contract has a popular and a technical meaning, parol evidence of usage and custom is admissible to show which meaning was intended. (Parsons on Contracts, vol. 2, pp. 660, 959; Lawson on Contracts, sec. 383; Greenleaf on Evidence, secs. 292, 295; Brown on Usages and Customs, 32; Lawson on Usages and Customs, pp. 367, 401, 405; May on Ins., secs. 173, 179a; Joyce on Ins., sec. 246; Finnie v. Clay, 2 Bibb., 351; Vance v. Marshall, 3 Bibb., 150; Buckwalter v. Hutcherson (Ky.), 66 S. W., 602; Smith v. Wilson, 3 Barn. & Adol., 728; Lowe v. Lehman, 15 Ohio St., 179; Brown v. Byrne, 77 Eng. Com. L. Rep. (3 El. & Bl.), 702; Coit v. The Commercial Ins. Co., 7 Johns. (N. Y.), 385; Myers v. Sarl, 30 L. J. (Q. B., 9); 7 Jur. (n. s.), 97; Walls v. Bailey, 49 N. Y., 464; Newhall v. Appleton (N. Y.), 3 L. R. A., 859; Rindskoff v. Barrett, 14 Iowa, 101; Robinson v. Fiske, 25 Maine, 401; Hinton v. Locke, 5 Hill

Rochester German Ins. Co. v. Peaslee-Gaulbert Co.

(N. Y.), 437; Astor v. Union Ins. Co., 7 Cow., 202; **Dana v.** Fiedler, 12 N. Y., 40.)

(c.) The words sought to be explained need not be ambiguous. (Myers v. Sarl, 30 L. J. (Q. B.), 9; 7 Jur. (n. s.), 97; **Brown v.** Byrne, 77 Eng. Com. L. Rep. (3 El. & Bl.), 702; May on Insurance, secs. 173, 179a; Parsons on Contracts, vol. 2, 659; Lawson on Contracts, pp. 367, 401, 405; Greenleaf on Evidence, sec. 299.)

(d.) Parol testimony of the meaning of the word "noon" as used in insurance policies properly admitted. (Jones v. German Ins. Co. [Iowa], 81 N. W., 188, 46 L. R. A., 860.)

(e.) The courts of Kentucky judicially recognize the general use of standard time. (Proctor Coal Co. v. Finley, 98 Ky., 405.)

2. (a.) Direct loss or damage by fire is any loss which by an unbroken chain of causation comes from a fire. (3 Joyce on Ins., secs. 2779, 2775; Ermentraut v. Girard Fire and Marine Ins. Co., 63 Minn., 305; Lynn Gas & Electric Co. v. Meriden Fire Ins. Co., 158 Mass., 570.)

(b.) A policy covers any loss which happens during its currency, or happens inevitably from a cause acting at the time of its expiration. (Lockyer v. Offley, 1 Term Rep., 252; Knight v. Faith, 15 A. & E., N. S.; Q. B., 666; Coit and Woolsey v. Smith, 3 Johnson's Cases, 16; Howell v. Protection Ins. Co., 7 Ohio, 404; Peters v. Phoenix Ins. Co., 3 Sergeant & Rawle, 25; Meretony v. Dunlope, 1 Park on Ins., 51; 3 Joyce on Ins., secs. 2792, 2793 (note 309); 2 May on Ins., sec. 401.)

OPINION BY JUDGE O'REAR.

The Peaslee-Gaulbert Company and Louisville Lead & Color Company are distinct corporations, but operating together a plant for the manufacture and sale of paints, oils and so forth. The plant consisted of three buildings, located at Fifteenth street and Portland avenue, in Louisville. The buildings were separated by alleys, occupied by railroad tracks, but were connected by overhead bridges with doors at their ends. Two of the buildings, one owned by the Peaslee-Gaulbert Company, known as the "Fifteenth Street Warehouse," and another owned by the Louisville Lead & Color Company, known as the "factory" building, were also physically connected, in addition to the bridges mentioned by a belt canopy extending

from one building to the other, and formerly used to shelter a belt operated from the factory building, so as to run a pulley and elevators in the warehouse building. It had not been used, though, for some time, and was left so that it afforded an opening from one building to the other, the canopy or chute constituting a sort of flue or vent. All the properties, including the contents of the Fifteenth street warehouse building, were insured against loss or damages by fire under a number of policies issued by various companies, including the policies sued upon in these actions. The policies are indentical in terms. Two of the cases (National Fire Ins. Co. v. Peaslee-Gaulbert Co. and Pacific Fire Ins. Co. v. Louisville Lead & Color Co.) present the same sole question for decision on this appeal. The other case, Rochester German Ins. Co. v. Peaslee-Gaulbert Company, presents the same question and one other. Hence the appeals are heard and decided together, though coming from different branches of the circuit court.

The question for decision that is common to all the cases is the construction of the term "noon" contained in the clause of the policies which reads, "does insure (the insured) from the first day of April, 1901, at noon, to the first day of April, 1902, at noon." A fire occurred in the insured premises on April 1, 1902, by which all the insured property was totally lost. Whether the loss occurred before "noon" of that day is the question. The fire originated in the "factory" building at about 11:45 a. m., standard time. The alarm was turned in at the fire department of the city at 11:59 a. m., standard time, according to the records of that department. The difference between central standard time, based upon the mean time of the ninetieth meridian west of Greenwich, and mean solar time at Louisville, is 17½ minutes. So that at 11:45

a. m., standard time, it would be reckoned 12.02½ p. m., sun time at Louisville. In declaring upon the policies plaintiffs pleaded: ''The plaintiff states that the word 'noon' contained in said policy, and at the time said policy was issued, had two meanings, largely dependent upon the community in which said word was used. One of these meanings was 12 o'clock midday by what is commonly called 'sun time,' and one was 12 o'clock midday by what is commonly called 'standard time.' Said fire occurred after 12 o'clock midday, sun time, and before 12 o'clock midday, standard time, as was in use in Louisville, Ky., where the property destroyed and damaged was situated. At the time said policy was executed and delivered the word 'noon,' as used in the city of Louisville, in business transactions, in making engagements, and in ordinary speech and writing, was understood to mean 12 o'clock midday, standard time, and such was the sense in which the parties to the policy sued on use said word in said policy.'' The contention of appellants is that the word ''noon'' has a fixed, certain and universally understood meaning, having reference alone to the physical fact of the coincidence of the center of the sun's circle with a given meridian of the earth; that proof of custom can not be admitted to alter or contradict plain, unequivocal words, when used in a written contract in their ordinary sense.

Authorities are abundant to the effect that words of well-understood meaning in their ordinary sense may, by the custom of a class, trade or profession, have a peculiar and different meaning when used with reference to the custom or general dealing of such trade or profession, and evidence may be received to show such exceptional use and meaning. Tradesmen, artisans and professionals of various

callings give to certain ordinary words a meaning
peculiar to their calling or trade, and in contracts
may use such words altogether with reference to such
terminology. It would be a miscarriage of justice
not to construe such words as they were understood
and used by the parties, as otherwise they would be
held to have made a bargain which neither ever con-
templated. But the proposition here is not to limit a
word of common meaning to the use of a particular
business sect, who, by its employment, have imparted
to it a peculiar meaning, different from its general
one, when employed by them to express an idea or
fact in the course of their business. On the contrary,
it is that a word of most common use has come to
have a general meaning, common to everybody, dif-
fering from its original meaning, and therefore pre-
sumably used by the parties to a contract in its most
common and general sense. The construction of
words in a written contract is for the court, generally.
If ambiguous, the meaning intended may be gathered
by the aid of parol or other extrinsic evidence. Or
if used in a sense peculiar to some special calling or
trade, as has been seen, the custom may likewise be
shown, by parol, which has given the word its extra-
ordinary meaning in the case. The word now under
consideration had for a great many years only one
meaning, which was undoubtedly the one contended
for in the case by appellants. But for the last ten or
fifteen years, as the court will take notice, the custom
has grown to be well-nigh general throughout the
country to give the word "noon" a slightly different
meaning. Both meanings refer to the same fact; that
is, midday. The division of time into days of 24 hours
each is itself conventional. Nor has it been uniform al-
ways to divide it so that the day began at midnight.
While it may be possible to divide the calendar year

into days of exact equal length for all practical pur-
poses, no clock has as yet been made that records ac-
curately the apparent movement of the sun, or,
strictly, the movement of the earth with respect to
the sun, so that the relative position of those bodies
is shown exactly day after day.  As the coincidence
of the sun with any given meridian of the earth varies
daily, a clock or other timepiece which is not made to
vary correspondingly--- and none does that we know
of--- will not accurately record the fact of such coinci-
dence probably more than twice in each year.  It
would be impracticable to attempt to apply to the
ordinary affairs of life a system of marking time that
had to depend upon difficult mathematical and astro-
nomical calculations to determine the exact time,
when time was an element of a fact to be determined.
Instead, a system of mean or average time has been
adopted always.  It represents approximately by
averages the relative positions of the sun and the
earth's meridian.  The names given to the system
and its variations have been adopted by an extend-
ing of their use until by custom they have become
general; words construed to represent such divisions
of time have had given to them a general meaning in
keeping with their uses.  Terms in contracts in which
time is of the essence are construed according to the
common or general meaning of the words.  As is
well known, words change in their meaning.  This
is because they come to be so frequently employed
in a different sense from that of their former mean-
ing that the changed definition comes to be the com-
mon one.  Of these changes the courts must take
notice, as they do judicially of all matters of com-
mon knowledge.  When, however, a word is under-
going the change, its use in a contract may have
reference to its former or later meaning.  So it may

be said to be ambiguous, having more than one meaning. The object of all construction being to arrive at the true intent of the parties to the compact, and it being the province of the courts to construe the language of written contracts, words of one meaning will be construed conclusively by the courts according to that meaning. But it would be unsafe and unjust to follow an ironclad rule of construction—that of single meaning—where it was commonly employed in different senses even concerning the same subject. To put the court in the light of the situation in which the parties were when they entered into the contract, in construing such terms parol evidence ought to be admitted to show that the custom of that community was such, so general, and of such long standing and notoriety that the parties may be presumed to have been controlled by it in framing the terms of their agreement. Probably no better instance for the application of this course of construction will be found than in the cases at bar. Perhaps nothing enters more commonly into the affairs of life, every phase of it, than time. To know the time, and to act upon the means of such knowledge as if it were a practical certainty, is of the first importance in most of the transactions of daily life. A general custom adopted with reference to noting the hour means that in all walks it is acted upon tacitly as an accepted fact. So, although there is not, and has never been a legal establishment of any standard time in this State, it was formerly accepted without question that the customary mode of reckoning time by the solar system of days divided into 24 hours of 60 minutes each, each day beginning at midnight, and divided again at midday at or near the time when the sun was in the meridian, was meant, when speaking of the hour or time of day. Conditions

have arisen in the last several years by which the old custom of dividing and noting time has been abandoned in a very considerable portion of the United States, and there has been substituted for it another system, no less arbitrary, but more fully meeting all the needs of society. Allowing one hour for each 15 degrees of longitude west from Greenwich, the seventy-fifth meridian passing somewhere near Washington, the ninetieth near St. Louis, and so on, and, by establishing one uniform standard of time for all the territory within each of the sections named, a satisfactory, practical basis is attained. Business and social engagements naturally become adjusted to it. The custom originated, it is believed, with certain railroad lines in their endeavors to regulate the running of their trains which traverse wide sections of the country, so that unvarying and safe schedules might be adopted and enforced throughout a system where the average mean time was not widely different, yet was enough so to make danger in operating trains in different directions, on account of a minute or a few minutes' difference in the time of starting from the opposite extremes of the same line or section. Other business, including government and finally social affairs, adopted the same standards, until now it has become, in the more populous communities at least, almost exclusive. And this has been so for a number of years. Contracts to begin or end at an hour certain, without naming a standard for the reckoning of the hour, must be deemed to have intended the system in most common use. Or, if more than one standard was in use at the place where the contract was to be performed, and as both could not have been intended, it is admissible to prove the prevailing custom at the place of performance in the business of which the

contract under consideration partook, that the court might determine which was probably in the minds of the parties. "Sun time," as it is called, has so fallen into disuse in some communities that it is known only by comparison with "standard time," or by computation. It could scarcely be maintained that parties to a contract meant to adopt an hour for the termination of important contracts which never otherwise entered into their business or social affairs.

In the early case of Finnie v. Clay, 2 Bibb, 351, the parties had agreed that certain lands might be surveyed in "squares to the cardinal points." The survey was made according to the magnetic needle, and not to the cardinal points; that is, the true meridian. The court decided that, as the parties had not declared whether the courses should be run according to the true meridian or magnetic needle (the former being strictly and technically the meaning of the term used), the popular rather than the technical meaning should be adopted, and proof was admitted showing that at that time the usual and almost universal mode of making surveys was according to the magnetic courses. Said the court: "Where a usage has prevailed so long and so generally, it is much more reasonable to suppose the parties had reference to it than to the mode of surveying according to the true meridian, so little known and seldom used in practice. That an agreement ought to be interpreted with reference to the usage of the country, although such an interpretation is contrary to the technical meaning of the language used by the parties, is fully warranted by the English authorities."

The question we are now considering came before the Supreme Court of Iowa in Jones v. German Ins. Co., 110 Iowa, 75, 81 N. W., 188, 46 L. R. A., 860. The fire occured after 12 o'clock by sun time, but

before 12 o'clock m. standard time. The policy expired "at 12 o'clock at noon" that day. It was there said: "The court submitted to the jury whether, because of a known and established custom obtaining at Creston, the expression 'at 12 o'clock at noon' was intended by the parties to the contract to mean 12 o'clock standard time. While it was admitted that central standard time was in general use there by the railroad company, the schools and business men generally, it does not appear but that the sun time was also used by other people of the city. As common or sun time was presumed to have been intended, the burden was upon the defendant to show to the contrary, and the issue was rightly left for the determination of the jury. But is it noon at 12 o'clock standard time? If so, just before the change from central to mountain time at McCook, Neb., and other places on the same degree of longitude the sun reaches the meridian at about half past 12 o'clock. We are of opinion that it was not only necessary to show the customary use of standard time, but that by custom of the place 'at 12 o'clock at noon' meant at 12 o'clock standard time."

Appellants would distinguish the Iowa case from these, because the words "at 12 o'clock at noon," it is claimed, have a different meaning from the word "noon." We think the expressions amount to the same thing. Both refer to midday. Noon is midday; so is 12 o'clock in the daytime. "Noon" is merely a shorter expression than "12 o'clock in the daytime." Originally it represented the ninth hour of the day after sunrise, or about 3 o'clock p. m., and was the canonical hour of nones, at which was celebrated a religious rite. (Webster's Dictionary, "Nones.") It has ceased to denote the ninth hour of the day so long ago that it can scarcely be traced.

It came by usage to represent midday, or 12 o'clock solar time, which was deemed midday for so many years. The word is undergoing a similar change, or has undergone one in this country, in recent years, so that it represents now midday, not necessarily as shown by ''sun time,'' but by the standard in use, whatever it is. It does not, as counsel argue, represent a physical phenomenon, as does ''sunrise''· and ''sunset,'' any more than ''10 o'clock a. m.'' represents a physical phenomenon. Both terms, ''noon'' and ''10 o'clock a. m.,'' are used to express practical approximations and neither refers necessarily to the actual fact. In time, doubtless, the old standard of solar time, or for that matter, the more recent standards, may fall so entirely into disuse as to become obsolete. The word ''noon'' may then have but one meaning. In that event recourse to extraneous evidence to determine what is meant in written contracts would not be allowed. The evidence is that in some business, particularly that of banking, in Louisville, ''sun time'' is still used. In the present state of the use of the term, it was proper in our opinion to have submitted to the jury, as was done, whether the word ''noon'' as used in the contracts meant ''12 o'clock standard time,'' and that, in determining that fact, the following guide should be adopted by the jury, as given in instruction No. 3 (Judge Muir's): ''If the jury believe from the evidence that at the time said policy of insurance was issued there existed in Louisville, Ky., a custom or usage with reference to the meaning of the word 'noon,' so well settled, uniformly acted upon, and of such continuance as to raise a presumption that plaintiffs and defendant knew of it, and entered into the contract of insurance sued on herein with reference to it, such usage will govern the jury in arriving

at their conclusions under the first instruction.''

In the Rochester German Ins. Company case the further question arises, when must the loss occur? This question is presented by the following instruction: ''The court instructs the jury that the policy of insurance sued on herein insured certain goods for plaintiffs in their warehouse at the northwest corner of Fifteenth and Portland avenue against fire from April 1, 1901, at noon, to April 1, 1902, noon. Now, if the jury believe from the evidence that the fire which destroyed said goods started in said warehouse before noon on April 1, 1902, or if they believe from the evidence that said fire did not reach said warehouse before noon, but at noon the destruction of said warehouse from such fire was inevitable, they should find for the plaintiffs; but if they believe from the evidence that the fire which destroyed said goods did not start in said warehouse before noon on April 1, 1902, and that at noon, April 1, 1902, the destruction of said warehouse, as the result of said fire, was not inevitable, they shall find for the defendant.'' The evidence was conflicting whether the fire caught in this building before 12 o'clock noon, standard time. But under the instruction quoted, the jury were not required to find that it did in order to make a verdict for the plaintiff. It was held to be enough if the destruction of the warehouse from the adjacent fire was inevitable at noon. We are of opinion that this view of the case was error. The risk assumed by the insurer was that of loss or damage by fire pending the term written in the contract. It did not insure against peril to the property without loss during the policy term. If the fire broke out in the insured building before the policy expired, and continued to burn thereafter till it was totally destroyed, the loss is one occurring within the insured period. It

is all deemed one event, and not severable. A damage begun is damage done, where the culmination is the natural and unbroken sequence of the beginning. We have been cited to no case which holds that mere imminence of loss during the life of a contract of insurance, would justify a recovery, where there was in fact no loss or damage during the life of the contract. No case in either marine, fire, or life insurance so holds. To do so, would be to extend the term of the policy, and all liability under it, including its beginning, for a period beyond the contract for which the consideration was paid. Doubtless it was known to be inevitable, as it proved to be, that certain blocks of business houses in Baltimore would be destroyed by the great fire there recently, which burnt over a considerable part of the city, and raged for several days. Yet it is entirely possible that contracts of insurance expired upon the buildings last burned after the fire had begun elsewhere in their vicinity. It would be astonishing if the liability of the insurers was extended indefinitely beyond the term of their contract merely because a danger had occurred during the contract which would lead to loss thereafter. The physical connection between the insured buildings in these cases did not make them less certainly separate buildings. They were so treated by the parties in contracting the insurance, and were so in fact.

The judgments in the case of National Fire Ins. Co. v. Peaslee-Gaulbert Co. and Pacific Fire Ins. Co. v. Louisville Lead & Color Co. are affirmed. The judgment in the case of Rochester German Ins. Co. v. Peaslee-Gaulbert Co. is reversed, and that cause is remanded for a new trial under proceedings consistent herewith.

All concur, except JUDGE CANTRILL, absent.

Opinion extended by JUDGE O'REAR October 6, 1905:

Some of the policies were upon merchandise contained in the buildings that were discussed in the opinion, and not upon the buildings. The same principles announced in the original opinion will apply to the insured merchandise also. Where the fire had begun in the building containing the merchandise before the expiration of the policy term, and by reason of that fire it was impossible to remove or save the merchandise from loss or damage, it is to be deemed a loss occurring in the life of the policy, whether the fire was actually communicated to the specific articles of merchandise within such time or not.