# Clarke v. Blue Licks Springs Company.

(Decided June 20, 1919.)

## Appeal from Nicholas Circuit Court.

1. Contracts—Contract to Drill Well—Abandonment.—A contract to dig a well provided that it should be dug to a depth of 1,600 feet unless accepted or abandoned by the employer at a less depth, and further provided that if the well should be abandoned either before or at completion the contractor should draw all casing and plug the well. Held that the employer would not have the right after the well had been drilled to a depth of 1,550 feet to require the contractor to plug it at a depth of 1,000 feet at or near which point there was a flow of water which the employer desired to appropriate.

2. Contracts—Customs and Usages.—In order for an alleged custom to enter into and become a part of a contract and to affect the rights of the parties it must have been known to the parties and contemplated by them at the time as forming a part of the contract or of its terms; or it must have been of such long and universal use as to be presumed to have been known by them.

3. Contracts—Contract for Drilling Wells—Construction.—The ordinary meaning of the word "ream" as used in contracts for drilling wells is the process of enlarging a smaller hole and does not include the continuation of the larger hole after reaching the bottom of the smaller one, and the evidence in this case is insufficient to show a contrary or an alleged customary meaning so as to apply to the entire depth of the larger hole.

CONLEY & McCARTNEY and C. F. SPENCER for appellant.

HOLMES & ROSS for appellee.

Opinion of the Court by Judge Thomas—Reversing.

We shall refer to the parties as they were designated below, the plaintiff, H. W. Clarke, being the appellant here, and the defendant, Blue Licks Springs Company, a corporation, being the appellee here.

On May 28, 1912, the parties entered into a written contract whereby plaintiff agreed to bore on the land of defendant, in Nicholas county, a well for the purpose of obtaining Blue Lick water, petroleum, oil or natural gas. He was to receive as compensation for his work $1,000.00 for the first 600 feet in depth of the well, and $1.00 per foot for its depth thereafter not to exceed a total of 1,600 feet, but at any time before reaching that depth defendant had the right, if acceptable Blue Lick water

was found, to stop the boring and accept the well as a completed one to the point reached. If the well was accepted at any depth plaintiff agreed to put in the prescribed casing and clean the well out, after which his compensation under the contract would be due, but if the well was not accepted at any point to which it was bored and defendant should abandon it entirely plaintiff then agreed to draw the casing and plug the well, when he would be entitled to collect for his work. It was agreed that the well, if accepted, should be finished with 6-1/4 inch casing unless defendant concluded to finish it below 600 feet with 4-7/8 inch casing, all casing to be furnished by defendant and put in the well by plaintiff who was also to furnish all machinery and appliances necessary for doing the work. If at any time during the progress of the work it became necessary to finish the well according to contract any reaming was required plaintiff was to receive 50 cents per foot for all reaming done by him. Furthermore, if it became necessary during the progress of the work to shut off objectionable water or to prevent a cave-in, any casing should be put in the well plaintiff agreed to do it and afterwards draw such protecting casing and prepare the well for the agreed sized pipe as for a finished well.

As the work progressed Blue Lick water was found at different points but in such quantities, quality and force as not to be acceptable to defendant, and finally after about eighteen months from the time of beginning, the well had reached a depth of about 1545 feet. In the meantime there had been an agreement to substitute for the 4-7/8 inch casing 5 inch casing and about 1,550 feet of it had been put upon the ground. Some time prior to January 3, 1914, there had been some conversation about procuring an additional 50 feet of 5 inch casing. Letters had passed between the parties concerning it, and on the date mentioned defendant, by its manager, C. C. Cole, wrote plaintiff this letter: "Yours of the first was not received by me until this a. m., not in time to reply by today's mail. I did not order the 50' of casing you suggested in your letter, and if you strike water again below the amount of casing we have we will be willing to quit off there and measure up, hoping that you will not strike any more snags before you strike the end as it certainly has been a long wearisome job. Will try

and arrange for the balance of the money when the job is done.''

After receiving that letter plaintiff sunk the well to the depth of the 5 inch casing then on hand and about 6 feet in addition, and without notification to defendant put in the 5 inch casing from the top to the bottom of the well, a total depth of 1,545 feet, leaving a space at the bottom of about 6 feet uncased, in which space there was a stream of Blue Lick water found, but as to its quantity, quality, etc., the record is silent.

A few days after that casing was put in plaintiff made out his account against defendant amounting to $2,386.50, credited by $500.00 advanced to him on October 7, 1912, leaving a balance of $1,886.50 for which he demanded payment of defendant, but which was refused because it claimed that the well had not been finished according to contract; that plaintiff had wrongfully inserted in the well all of the 5 inch casing and demand was made of him to draw that casing and to plug the well at a point about 1,000 feet from the top, all of which he declined to do. He afterwards filed a lien for what he claimed to be due him as is provided in section 2463, Carroll's Kentucky Statutes, and later filed this suit to recover the amount of his claim and to assert a lien upon defendant's land to secure it.

The answer consisted of a denial of the allegations of the petition and in other paragraphs asserted a counterclaim, which consisted of $250.00 paid to plaintiff on August 30, 1913, and a like sum on November 6, 1913, and $345.00, being the value of 1,545 feet of 5 inch casing which it was claimed plaintiff wrongfully put in the well; $1,200.00 loss in profits which could have and would have been made in the sale of Blue Lick water if plaintiff had finished the well according to the contract as construed by defendant, and a few other smaller items claimed to have been paid by defendant and which it averred were properly chargeable to plaintiff under the terms of the contract.

A reply completed the issues and upon submission the court, at its September term, 1915, adjudged that the well had not been completed according to contract and that plaintiff had wrongfully inserted in it the 5 inch casing referred to and which the court found was done against the consent of defendant and when he knew that

defendant did not want it done. The judgment then proceeds: "He (plaintiff) is now given until the first day of the next term of this court to draw said string of 5 inch casing and he shall complete said well pursuant to the contract if said defendant wishes him to do so." Plaintiff did nothing towards obeying that order and at the succeeding term of court, which was held in February, 1916, his petition was dismissed as was also defendant's counterclaim, to which judgment both parties objected and excepted and they have both appealed to this court.

During the progress of boring the well a stream of Blue Lick water was found at a depth of between 950 and 975 feet which was not only the strongest stream found at any time but it was of the best quality and had the greatest force, the water from it coming to within 13 feet of the surface and flowing in such quantities as that it could not be lowered with the use of a pump. At that time plaintiff insisted that the well should be cased in and accepted by defendant, but in as much as it had the right to require as much as 1,600 feet of boring it insisted on going deeper with the final result which we have above stated. Later when it became evident that no better or acceptable stream of Blue Lick water could be found defendant insisted that under the contract it had the right to require plaintiff to draw the casing and to plug the well at any point it desired and case it in from the surface down to that point, thereby giving it the right to abandon a part of the well and accept another part, while defendant insisted that under the terms of the contract plaintiff was compelled to either accept or abandon the well at the depth to which it was bored and that he was not required to plug the well at *any* point unless it was entirely abandoned by plaintiff, and it is chiefly out of these different constructions put upon the contract by the respective parties that this litigation grew.

That part of the contract which we think is decisive of the question reads: "If the well, or wells, are abandoned by the second party (defendant) at any time before completion, or at completion, the first party (plaintiff) shall draw all casing from same and plug the well, or wells, free of charge, with the exception that the said second party shall furnish the plug." Other parts of the contract provide that if the well is accepted by defendant

plaintiff was to thoroughly bail and sand pump it and clean it out and in no event was any part of the contract price to be paid until the well was completed or abandoned as per terms of the contract.

We have closely read the testimony as well as the contract, together with briefs of counsel more than once, and after a careful consideration we have concluded that the proper construction of the quoted clause from the contract and the intention of the parties to be gathered therefrom support the contention of plaintiff rather than that of defendant.

It will be seen that the clause in question gave defendant the right to abandon the well either before completion or at completion and it was then that plaintiff should draw all casings therefrom and plug it. The plugging called for by the contract could be done at any point in the well since the purpose of it was to prevent the escaping of any gases, oils or other mineral and thereby prevent any dangerous condition as well as to preserve those substances from waste and such plugging did not require any recasing of the well. This, no doubt, is the intention and purpose of sections 3911 and 3912 of Carroll's Kentucky Statutes. The proof shows (as is perfectly manifest without it) that the hole of the size to receive the finished casing could not be plugged while any of that size casing was in the well, since the plug, in order to go through the casing, would be too small to fill up the hole below. This fact would necessitate the drawing of the casing and plugging the well and then reinserting the casing down to that point. Clearly if the well was accepted at the depth to which it was bored there would be no necessity of any plugging for the bottom of the well would of itself be a natural plug. And when defendant insisted upon plaintiff drawing the pipe and then plugging the well at a point between the bottom and the top and about three-fifths the distance to the bottom, it exacted of him an obligation not contemplated by the contract. To plug the well at such a point is shown by the evidence to be more difficult as well as expensive than to plug it near the surface, and in addition it would require plaintiff to draw all the pipe from the bottom or from whatever distance it had been inserted, and to plug the well at the given point and then reinsert the casing down to that point.

So when the matter was suggested to plaintiff he was correct in his insistence that the demand that he should plug the well at or in the neighborhood of 1,000 feet from the top so as to shut off all objectionable water below and enable plaintiff to appropriate the Blue Lick water found just above that point (950 feet) and thereby have a finished well of that depth, was not authorized by any of the terms of the contract. The contract nowhere provides for any plugging to be done except in case the well was abandoned; not even an intimation is found in the contract that it could be partially abandoned by defendant and plaintiff be required to plug it at any point which was passed in boring so as to make it a completed and accepted well down to that point. We therefore conclude that it was the duty of defendant to have either accepted or rejected the well to the depth which plaintiff bored it. If accepted it was then the duty of plaintiff to put in the casing as he did, but if abandoned it was his duty to draw the casing and plug the well as in case of an abandoned one, which, as we have seen, is one requiring no casing.

It is equally clear, however, that plaintiff wrongfully inserted the 5 inch casing in the well. A short while before he did so there were conversations between the parties looking to the plugging of the well at about the depth of 1,000 feet, and he had gone so far as to instruct defendant as to the character of plugs, which under the contract it was required to furnish, that would be necessary for the purpose. Efforts were being made by defendant at the time to have the plugs manufactured, all of which plaintiff knew before inserting the 5 inch casing. He, however, had objected to plugging the well at the depth of 1,000 feet as not being within the terms of his contract and defendant had inquired of him what would be the extra cost for doing so. These conversations very clearly show two things—(a) that plaintiff knew the well would not be accepted at the depth he bored it, and (b) defendant knew that the plugging of the well at any intermediate point and recasing it down to that point was not included in the terms of the contract.

Under these conditions plaintiff should not have inserted the 5 inch casing, but having done so it was his duty to have complied with the order of the court by drawing it which, as we have stated, he failed to do.

But, defendant was not authorized to attach, as it did, the condition that plaintiff should plug the well at the point designated. This demand, however, did not dispense with the duty of plaintiff to, in the first instance, not insert the 5 inch casing, but having done so to draw it as the court directed. Plaintiff having failed in these particulars it is clear that the rights of the parties demand that his claim should be credited with whatever it may cost to draw the 5 inch casing, and since he wrongfully put it in the well he should also be charged with the difference in value, if any, of it at the time it was put in the well and at the time it should be withdrawn. Defendant is not entitled to credit by the entire value of the 5 inch casing as though it had been converted by plaintiff since the cost of drawing it would be much less than its value, and when drawn it is the property of defendant. There is not sufficient proof in the record to enable us to say what the cost of drawing the casing would be nor can we say from the record what, if any, would be the difference in the value of it when drawn, and upon a return of the case both parties will be allowed to take proof upon these issues.

Another contention arises between the parties as to the true meaning of the word "reaming," as found in the contract. It is claimed by plaintiff that in drilling the well he reamed 813 feet for which he is entitled to charge 50 cents per foot, which is correct if he ascribes to that term the proper meaning as used in the contract. The definition of the word "reaming," as given by Mr. Webster, is "To widen the opening of a hole; to enlarge or dress out a hole with a reamer." Plaintiff concedes such is the proper definition of the word, but he contends that a custom prevailing among those drilling wells has enlarged the meaning of the word so as to include within the term all of the depth of the larger hole made after passing the bottom of the smaller one being reamed. For illustration—if a 5 inch hole extends the depth of 100 feet and it is desired to ream it so as to make an 8 inch hole and the latter dimensions are continued after passing the bottom of the 5 inch hole the entire distance of the 8 inch hole is properly considered as reaming. In the first place it is perfectly plain that the alleged customary definition is directly contrary to the meaning of the word as given by Mr. Webster, and for it to pre-

vail and be allowed to affect the contract and the rights of the parties it must be shown that the alleged custom through and by which it is done must either have been known and understood by the parties at the time of entering into the contract, and that the contract was made with reference to it, or the custom must have been of such universal use as that it would be presumed to have been known by the parties. 17 Corpus Juris 450 and 492; Postal-Cable Co. v. Louisville Cotton Oil Co., 136 Ky. 743; Rochester-German Insurance Co. v. Peaslee-Gaulbert Co., 120 Ky. 752. No such customary meaning of the word is shown to have existed in that community. It is true that plaintiff testified to the existence of such a custom among well drillers and introduced a witness who testified as to the custom prevailing among drillers of oil wells in communities far removed from the vicinity where the well involved here was being drilled, but neither of them attempted to say that any such custom prevailed in that vicinity. Besides a number of witnesses, some of whom were well drillers in the immediate vicinity, testified to the contrary and further said that the word "reaming," as used in the contract, meant only the enlargement of a smaller hole to its bottom, and that the reaming ceased when the bottom of the small hole was reached, although the larger hole was continued on below that point. So we conclude that the only reaming in the contract under consideration for which plaintiff is entitled to collect at the rate of 50 cents per foot is actual reaming and enlarging of a smaller hole, as above indicated. The testimony as to the amount of this character of reaming which plaintiff did is so vague, indefinite and uncertain as to make it impossible to tell the amount due him for this item, and upon a return of the case further preparation should be made so as to enable the court to determine the amount due plaintiff for the actual reaming he did under the contract.

The other items claimed by plaintiff include small sums, the aggregate of which is only $29.00. And after considering the evidence we do not think it sufficient to entitle him to collect any of them.

This leaves the amount due plaintiff $1,000.00 for the first 600 feet and $951.00 for the remainder, making a total of $1,951.00. To this should be added the sum found to be due him for the actual reaming he did.

From this should be deducted payments made with interest from the dates made, and the cost of drawing the 5 inch casing plus any damage or depreciation in the value of it since being placed in the well and he should be given a judgment for the difference unless defendant is entitled to recover on some portion of its counterclaim.

The principal item in the counterclaim, aside from the value of the 5 inch pipe we have considered, and payments made, is that seeking to recover $1,200.00 for the loss of profits in being deprived of the use of the well, but since plaintiff was not required to plug the well so as to enable plaintiff to use the water, as we have found, nothing can be recovered for this item even if the proof and the pleadings were sufficient to enable it to do so, which, however, we do not find to be true. In the first place the amount of such profits is purely speculative and there is not sufficient evidence to show that defendant would or could have sold any of the water if it could have obtained it. The remaining items of the counterclaim consist of small sums alleged to have been paid by defendant during the progress of the work for repairs upon some of the machinery, which machinery it was required to and did furnish; for some packing and perhaps for other purposes, all of which it claims should have been paid by plaintiff, but they aggregate only a small amount and the evidence concerning them is not by any means convincing the one way or the other, and upon the whole we have concluded that the rights of the parties will be properly adjusted by the rendition of the judgment which we have hereinbefore indicated.

Wherefore the judgment is reversed with directions to proceed in accordance with this opinion.