GLOBE & RUTGERS FIRE INS. CO. OF NEW YORK v. DAVID MOFFAT CO.

(Circuit Court of Appeals, Second Circuit. April 30, 1907.)

No. 32.

1. INSURANCE—POLICY—DELIVERY IN SISTER STATE.

Where a fire policy insuring property in Virginia was executed, accepted, and delivered in New York by a company not authorized to do business in Virginia and having no agent there, it was not affected by Va. Code 1904, p. 630, § 1296a, providing that fire insurance companies not incorporated by the laws of the state, but legally authorized to do business therein, shall not make contracts of insurance on property in Virginia, save through regularly constituted agents residing within the state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 173.

What law governs policies, see note to Corley v. Travelers' Protective Ass'n, 46 C. C. A. 287.]

2. SAME—POLICY—CONSTRUCTION.

Where insured prepared an elaborate rider describing the property intended to be covered, which was attached to the policy, such rider should not be expanded as against the insurer beyond its plain and ordinary

meaning, on the theory that the policy should be interpreted against the insurer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 295.]

3. SAME—PROPERTY COVERED.

Plaintiff tanning company prepared an elaborate rider to be attached to its insurance policies, attempting to specify every species of property for which insurance was desired on plaintiff's premises, which rider referred to a plan of the premises on file in the office of plaintiff's insurance broker. The rider attached to the policy in question provided no insurance on "bark ground and unground" contained in the building marked "3" on the plan, nor on bark and liquors in the leach house and coolers marked "2" on the plan, or on bark and liquors contained in a leach house marked "16," nor on the bark sheds on the tannery premises marked "8" on the plan, but $10,000 on "bark in piles and under sheds on the tannery premises marked 8 on the plan." *Held*, that the policy should be construed to include bark in piles on that part of the tannery premises marked "8," and did not include a bark pile in a square plot on the premises not so marked, but in proximity to a bark shed.

4. SAME—CONSTRUCTION—WHAT LAW GOVERNS.

Where a New York insurance policy was issued on property located in Virginia, and provided that it should expire "at noon" on a certain day, the contract, being performable in Virginia, was not governed by Laws N. Y. 1892, p. 1491, c. 677, § 28, providing that an act required to be performed within a specified time should be performed according to standard time.

5. CUSTOMS AND USAGES—INTERPRETATION OF CONTRACT—EVIDENCE.

Where a New York fire policy, providing that it should expire at noon on a specified day, was performable in Virginia, parol evidence was admissible to show the custom of the place where the property was insured for the purpose of determining whether the parties intended the time to be governed by standard or solar time.

In Error to the Circuit Court of the United States for the Southern District of New York.

This cause comes here upon writ of error to review a judgment of the Circuit Court, Southern District of New York, entered upon a verdict in favor of the defendant in error, who was plaintiff below, in an action to recover a loss by fire under a policy of insurance.

F. R. Coudert, John P. Murray, and Coudert Bros., for plaintiff in error.

T. L. Frothingham, Edward M. Shepard, and Steele, De Friese & Frothingham, for defendant in error.

Before WALLACE, LACOMBE, and TOWNSEND, Circuit Judges.

LACOMBE, Circuit Judge. Plaintiff owned a tannery plant, comprising several buildings with open spaces between and around them, located at Iron Gate, Va. It took a policy of insurance in the amount of $10,000 from the defendant, covering none of the buildings, but only bark in piles and under sheds. The policy was for one year, expiring at noon of January 8, 1902. Some time between 11:20 and 11:30 a. m. of that day, an explosion occurred in one or more of the buildings, and both buildings at once caught fire. Thereafter the fire spread to and consumed a large quantity of bark, some in an uncovered stack or pile; and some under sheds, for total loss of which the action was

brought. Questions of fact much disputed in the testimony were: The precise time when the explosion took place, the precise time when the bark in the uncovered stack or pile ignited, and the precise time when the bark under sheds ignited. The pertinency of these questions is apparent from the instruction given to the jury that, if, at noon on the day of the fire, any part of the insured bark was so ignited that naturally and inevitably and directly, without the intervention of any new cause, it must have been consumed and destroyed by fire, then the jury must find a verdict for the plaintiff for the full amount of the insurance. This instruction correctly stated the law, and the jury rendered a verdict for the full amount, with interest. The questions presented upon this appeal are: (1) What was "the insured bark"? (2) What moment of time was "noon" within the meaning of the policy? (3) Whether there was any breach of warranty by the insured. In determining these questions, it will be necessary to set forth the language of the policy at some length.

The defendant had no license to do business in Virginia, and at the time had no agent in Virginia. There was put in evidence section 1269a of the Laws of Virginia [Va. Code 1904, p. 630], which enacted that:

"Fire * * * insurance companies not incorporated by the laws of the state of Virginia, but legally authorized to do business in this state, shall not make contracts of insurance on property herein save through regularly constituted agents of such companies residing in the state of Virginia."

What bearing this statute was supposed to have upon this case is not apparent. The defendant company was not within its terms, since it was not "legally authorized to do business" in that state. Moreover, the act was powerless to affect the contracts of an insurance company of another state made outside of Virginia. The application for this policy was made in New York by the regular insurance broker of the plaintiff, was accepted here, and the policy executed here. The policy is in the standard form of New York policy. It begins with the statement that:

"The Globe & Rutgers Insurance Company in consideration of the stipulations herein named and of one hundred dollars premium does insure David Moffat Company for the term of one year from the 8th day of January, 1901, at noon, to the 8th day of January, 1902, at noon, against all direct loss or damage by fire, except as hereinafter provided, to an amount not exceeding ten thousand dollars, to the following described property while located and contained as described herein, and not elsewhere, to wit."

Here follows the extensive blank space found in all forms of policy. It has not been filled in with any written or typewritten description of the property, but an elaborate and detailed printed description has been pasted in as a rider and made a part of the contract by signature of an officer of the company. This printed paper bears internal evidence of having been prepared by the Moffat Company. It contains separate descriptions of all the buildings on the plant (none of which are covered by this policy), and bears the printed signature "Charles M. Clarke, 100 William Street, New York," the insurance broker of the Moffat Company. This printed description, thus inserted, reads as follows

(some details of enumeration being omitted for the sake of brevity, and for convenience of reference the word "bark" is italicized where-ever it occurs; there are no italics in original):

"David Moffat Company.

"On the following described property situate on premises of the Iron Gate Tannery, at Iron Gate, Alleghany county, Virginia, as per plan No. 437 filed in the office of Charles M. Clarke, viz.:

"Nothing...at...On the frame and iron buildings known as the 'Boiler Houses and Bark Mill,' including foundations * * * also on steam engines * * * and all tools * * * contained therein, and marked No. 1 on said plan.

"Nothing...at...On the frame buildings known as 'Leach House and Coolers,' including foundations * * * also on steam engines * * * and all tools * * * and on *bark* and liquors contained therein, and marked No. 2 on said plan.

"Nothing...at...On the frame building * * * known as 'Beam House, Yard and Dry House,' including foundations * * *; also on buildings containing liquor tanks * * *; also on steam engines, machinery * * * and all tools * * * contained therein and marked No. 3 on said plan.

"Nothing...at...On hides and leather, * * * and on hair and glue stock, all while contained in said building marked No. 3 on said plan.

"Nothing...at...On *bark*, ground and unground, * * * tanning materials and supplies, contained in said building marked No. 3 on said plan.

"Nothing...at...In the frame building known as the office, including office furniture * * * contained therein and marked No. 15 on said plan.

"Nothing...at...On the frame building known as 'Hair House' including all machinery * * * contained therein, and marked No. 5 on said plan.

"Nothing...at...On the frame building known as 'Lime House,' including lime and other merchandise contained therein, and marked No. 6 on said plan.

"Nothing...at...On the frame building, including vats and all machinery and supplies contained therein, and marked No. 9 on said plan.

"Nothing...at...On the frame building, including vats and all machinery and supplies contained therein, and marked No. 10 on said plan.

"Nothing. .at...On the frame building, including vats and all machinery and supplies contained therein; and marked No. 11 on said plan.

"Nothing...at...On the stone building known as 'Yard No. 12' including vats and all machinery and supplies contained therein, and marked No. 12 on said plan.

"Nothing. .at... On hides, skins and leather contained in said building, marked No. 12 on said plan.

"Nothing...at...On the frame building * * * occupied as a dwelling * * * and marked No. 13 on said plan.

"Nothing...at...On frame building known as 'New Leach House' including foundations * * * also on steam engines * * * and all tools * * * and on *bark* and liquors contained therein and marked No. 16 on said plan.

"Nothing...at...On frame *Bark* Sheds, situated on the tannery premises, and marked No. 8 on said plan.

"$10,000 at 1% on *bark* in piles and under sheds, on the tannery premises, and marked No. 8 on said plan.

"Privilege to make necessary additions and this policy to cover therein and thereon, and to make alterations, and repairs. * * * This policy shall cover any direct loss by lightning."

The plan referred to is herewith reproduced. The explosion occurred in "Bark Mill No. 1" and "Leach House No. 16." At the time of the fire there was no pile or stack of bark adjoining Bark Shed No. 8, northeast of the railroad track. There was a pile or stack of

bark adjoining Bark Shed No. 8, southwest of the track, and lying between the shed and the Leach House No. 16. That stack and the bark in both bark sheds were all consumed.

In construing the above-quoted description, it should be borne in mind that it was not composed by the insurance company. With

painstaking accuracy the insured has prepared an elaborate and comprehensive enumeration of every variety of property it had at risk, distributed into separate groups, so as to enable it readily to insure one group in one company and another in another, and has secured the insertion of such complete enumeration unchanged in the body of the policy, although of the 17 groups this company has underwritten but a single one. This was a commendable method of filling in the description of property different portions of which were, presumably, insured in different companies; and the insured has relieved the printed description, which it prepared, of what might otherwise present uncertainties, by accompanying it with a plan or map drawn to scale after survey.

In our opinion a part of the contract, thus prepared by the insured himself, is not to be expanded as against the insurer beyond its plain and ordinary meaning, on any theory of interpretation against the issuer of the policy. The insured has himself prepared a description which distributes his insurable property into groups, and he should not complain if liability for a subsequent loss is adjusted upon the basis that the insurance written on a single group covers only that group as the printed description and the plan describe it.

Looking now at the printed description of the property insured— "bark in piles and under sheds, on the tannery premises, and marked No. 8 on said plan"—the first suggestion is that it seems to imply that the bark insured shall be not only "in piles," but also "under sheds." The phrase used is "bark in piles and under sheds," and the group next immediately preceding is "bark sheds, situate on the tannery premises and marked No. 8 on said plan." A careful study of the description shows that the draughtsman has in other cases provided for insurance on a particular building and fixtures in one group, and immediately thereafter for the contents of the building in a separate group. See the Beam House No. 3, and Yard No. 12. It would be not at all a forced construction, but on the contrary a reasonable and natural one, which would restrict the last group to bark which was piled up under the frame Bark Sheds No. 8 of the preceding group. It would be a forced and unnatural construction which would broaden the language so as to include "bark in piles" wherever it might be on the tannery premises. If one wished to express that idea, it would be sufficient for him to say "bark in piles on the tannery premises," without adding the other words. Having added them, it is safe to presume that he did so because he wanted to express the idea which their addition naturally conveys. Moreover, the clause cannot be held to cover all bark in piles anywhere on the tannery premises, because the printed description expressly states that by this policy there is insured nothing on bark contained in the leach house, nothing on bark contained in Beam House and Yard No. 3, and nothing on bark contained in the new leach house.

A reference to the plan, however, indicates that the draughtsman did not intend to limit insurance to bark under the sheds No. 8, as the text of the description seems to indicate. So far as the text shows, the only "No. 8" is certain bark sheds; but the plan shows other places than these sheds also designated by the number "8," so that the clause

may fairly be read to cover bark not under sheds, but in piles, on such part of the tannery premises as are marked No. 8 on the plan. Looking now at the plan, we find certain portions of the premises marked as "Bark Yard No. 8." At the right-hand side of the plan those words are written directly across the two bark sheds, thus indicating that the sheds themselves are located in the bark yard. The title extends beyond the shed northeast of the railroad track into an open space, indicating that, until the boundary line of some other part of the property is reached, that open space is part of the bark yard. The same title extends beyond the shed southwest of the track into another open space, and the words "Bark Yard No. 8" are repeated in the lower right-hand corner, indicating that such open space, so far as the plan shows it to be open, is also a part of the bark yard. To the left of the plan (northerly and westerly of the main group of buildings), the words "Bark Yard No. 8" again appear, in an open space lying southwest of the track. It appears that at the time the plan was prepared bark was stacked in this part of the yard along the track, from the dotted line, which indicates the plot of land surrounding the main buildings to the property line of the plant—or at least to the limit of the property shown on the plan. To the left of the main group of buildings, however, northeast of the railroad, in the space where structures Nos. 9, 10, 11, 12, and the storehouse and dwelling ("Dwg") are scattered about the designation "Bark Yard No. 8" does not appear; nor is that title written across the track as at the other side of the plan. Between those portions of the bark yard, lying southwest of the track, and marked "No. 8," there is a square plot of land indicated by the railroad track and by a dotted line. This is not designated by any name, but within it are located the office and Leach Houses No. 2 and No. 16 besides a pump and tank. The testimony shows that at the time of the fire there was nothing on the property corresponding to the dotted line—no fence or inclosure. It may be inferred, in the absence of testimony to the contrary, that such was the condition of affairs when the policy was issued; but that circumstance is not material. There is nothing to show that the insurer made any examination or survey of the property before underwriting. It accepted the description of the premises contained in the printed statement and plan which the insured furnished. The impression conveyed to any one looking at that plan would be that out of the whole space southwest of the track there was reserved a square plot as a location for the office, leach houses, etc., and that the remainder only was "Bark Yard No. 8." And the plan, taken in connection with the description, seems quite plainly to indicate that the risk taken is on bark in piles on that part of the tannery premises marked "No. 8."

As has been seen, at the time of the fire, there was a stack or pile of bark within the square plot indicated by the dotted line and close to the southwest bark shed. This pile was consumed, and its value ($2,625) is included in the verdict. Under the construction given to the contract, supra, the contents of that pile were not within the risk. Defendant requested the court so to instruct the jury, which was denied, and exception taken. This error cannot be corrected merely by deducting the value of the stack from the amount of the verdict. Un-

der the instruction which was referred to at the outset of this opinion, the jury found that part of the insured property was on fire before noon; but they might, under the charge, have reached this conclusion, although they were satisfied that, although at that time the stack was on fire, no spark had as yet reached either shed. Two or three of defendant's exceptions sufficiently raise this point.

As there must be a new trial, it is important that this court should express its opinion on another question which has been raised in the case, viz.: What is the meaning of the word "noon"? Did the policy expire at 12 o'clock by "Eastern standard time," or at 12 o'clock by mean solar time at Iron Gate? The difference of time is 19 minutes.

Apparent solar time is time measured by the actual passage of the sun over meridian. Owing to the variability of this measure, apparent time is a varying quantity, and therefore for purposes of practical convenience an arbitrary measure was long since adopted, known as mean solar time. Mean solar time is defined by the motion of a fictitious sun called "the mean sun," which is imagined to move with perfect uniformity, being sometimes behind the true sun, and sometimes in advance of it. Mean solar time changes with the longitude, and in a country of this magnitude the difference of time between places caused much difficulty in the regulation of the movements of railway trains. Therefore, about the year 1883, the principal railroads of the United States adopted an arbitrary standard for the purpose of securing uniformity in the operation and connections of their trains. Under this system, the country was divided into four sections (Eastern, Central, Mountain, and Pacific), approximately 15 degrees in width from east to west, and the time of the central meridian of each section was adopted as the uniform railroad time for the entire section. "Eastern standard time," under this system, was the actual time of the seventy-fifth meridian west from Greenwich. New York City and Iron Gate are both in the Eastern section.

What meaning is to be attached to the word "noon," as used in this policy? Is it 12 o'clock mean solar, or 12 o'clock standard time? In the first place, it may be noted that this is a question of the construction of a contract inter partes. No official action, such as the opening of a court, is involved, as was the case in Curtis v. March, 3 H. & N. 866; Henderson v. Reynolds, 84 Ga. 159, 10 S. E. 734, 7 L. R. A. 327; Searles v. Averhoff, 28 Neb. 668, 44 N. W. 872; Texas T. & L. Co. v. Hightower (Tex. Sup.) 96 S. W. 1071, 6 L. R. A. (N. S.) 1046; and Ex parte Parker, 29 S. W. 480, 35 Tex. Cr. R. 12. The rule of construction which applies to all other contracts applies to contracts of insurance—effect must be given to the intention of the parties. Ripley v. Ætna Ins. Co., 30 N. Y. 136, 86 Am. Dec. 362. What did both sides understand to be the time limits of this contract when it was made? By what measurement of time was noon of January 8, 1901 (its beginning), and noon of January 8, 1902 (its ending) to be regulated? If the contract were one to be performed here, the answer would be easy. Section 28, c. 677, p. 1491, Laws N. Y. 1892, provides that—

"the standard time throughout this State is that of the seventy-fifth meridian of longitude west from Greenwich and all courts and public offices and

legal and official proceedings, shall be regulated thereby. Any act required by or in pursuance of law to be performed at or within a prescribed time, shall be performed according to such standard time."

Business in this city has conformed itself to this regulation so universally that this court will take judicial notice of existing conditions. It is according to standard time that the teller's windows in every bank, state and national, open and close; that the hour of delivery is fixed for all stocks, bonds, warehouse certificates, and other evidences of ownership of property bought and sold on all the exchanges; that the vast army of labor begins and ends work; that vessels depart for every port foreign and domestic; that every business and social engagement is made and kept. It is the time according to which all clocks displayed on tower, façade, and post, and in every watchmaker's window are regulated; at which the "time-ball" on the tower of the telegraph building falls, and to which the watches in the pockets of every individual, who undertakes to keep his watch timed at all, are conformed. It would require very strong evidence to show that in a contract for a term of insurance upon property in this city the parties intended that the term should be measured otherwise than by standard time.

Nevertheless, conditions may be so different in other localities as to lead to a different conclusion as to the meaning of the word "noon." The map shows that at Pittsburgh, Pa., Eastern standard time ceases, and Central standard time begins. Of the conditions in that city this court cannot take judicial notice. One time or the other, or both, may be in common use. It may be 11 o'clock on one block when it is 12 o'clock on the other. Courts and public offices may conform to one time and business to another. Different branches of business may regulate their affairs by different times. It would seem to be the proper disposition of a case, where the court cannot take judicial notice of the conditions, to receive testimony as to what they were. Such a disposition of a similar case was approved by the Court of Appeals of Kentucky, in Rochester German Insurance Co. v. Peaslee Gaulbert Co., 87 S. W. 1115, 27 Ky. Law Rep. 1155, 1 L. R. A. (N. S.) 364. In the case at bar defendant put in testimony bearing upon this question, and contends that it is uncontradicted and controlling. We do not pass upon it now, because there will have to be a new trial, and the testimony then presented may not be precisely the same. The trial judge charged the jury that:

"In the absence of any language which indicates another intention, the law is so that by 12 o'clock noon is meant noon by solar time, which at Iron Gate, Va., occurs about 19 minutes later than the noon fixed by standard time."

To this defendant excepted, and the record discloses sufficient as to conditions prevailing at Iron Gate to sustain this exception.

Incidentally, it may be noted that the words whose meaning is in dispute—"at noon"—are not words selected by the insurer. They are imposed alike upon insurer and insured, who contract in this state, by the statutes prescribing the so-called "Standard form of Fire Insurance Policy," which will be found in Richards on Insurance (2d Ed.) Append. p. 584. As to construction of a form thus prepared, see Peabody v. Satterlee, 166 N. Y. 174, 59 N. E. 818, 52 L. R. A. 956.

There is no force in the suggestion that defendant has not pleaded usage or custom as to observance of time at Iron Gate. Plaintiff is seeking to recover upon a contract, which contains what is perhaps an ambiguous term. It means one thing where the contract is made; it may mean a different thing where it was to be performed, and testimony calculated to relieve that ambiguity may be received without being specially pleaded.

We are unanimously of the opinion that the application, description, and plan did not contain a warranty or representation that at the time of the fire there would be no pile of bark elsewhere on the premises than in the bark yard.

Judgment reversed, and cause remanded for a new trial.