POWELL v. GATE CITY BANK et al. †

(Circuit Court of Appeals, Eighth Circuit. April 25, 1910.)

No. 3169.

*(Syllabus by the Court.)*

**1. BANKRUPTCY (§ 303\*)—PREFERENCES—TRANSFER TO DEFRAUD CREDITORS.**

In June, 1908, the H. Co., a corporation with a capital stock of $500,-000, the great majority of which was owned by H., was trading in crockery in Kansas City, had a stock of goods worth from $100,000 to $125,-000, and was insolvent, but its insolvency was unknown to those dealing with it, and it had the general reputation of great prosperity and high credit. The C. Co. was a corporation engaged in trading in cutlery in the same city with a capital stock of $10,000, all but one share of which was owned, one half by A. and the other half by R., his brother, and this corporation had a stock of goods and other property worth $70,000 above its debts. R. was the manager of this business, and A. gave it little attention. The H. Co. was rated worth from $300,000 to $500,000 and given the highest credit by the commercial agencies of Dun and Bradstreet, and the corporation and the brokers of its notes had made statements during the year which showed it to be worth more than $250,000 above its debts. H. had been sued for $100,000 for alienating the affections of another's wife on April 23, 1908. On April 24th the bank had bought of brokers two of its notes for $2,500 each, due July 6, 1908. On May 1st, R., who had not been a banker, became its president. On May 2d he agreed for the bank to give the H. Co. a line of credit of $20,000 on condition that it would keep $10,000 on deposit in the bank and would pay the loan upon call. By reason of this contract the bank discounted for 90 days three of the H. Co.'s demand notes, one for $10,000 on May 11th, one for $5,000 on May 22d, and one for $5,000 on June 6th. On June 22d the H. Co. drew from the bank and caused it to wire $5,000 to New York to pay one of its notes, and this reduced its balance in the bank to less than $400. On that day the bank asked payment of H. Co.'s notes, and on June 24th the H. Co. deposited $30,000 in the bank which it had received from a loan made to it by R., and with this money it paid all its notes held by the bank and a note for $5,000 which it owed Burr & Co. in New York. About June 20th, at the request of H., R. agreed to loan $25,000, which was increased to $30,000 on June 23d, upon the collateral notes of the H. Co. secured by about $30,000 worth of the goods of that company, on condition that R. might return and credit on the notes at cost any of these goods that proved unsalable. R. had $16,000 to his credit in the bank when he made this agreement, and he borrowed of the bank $15,000 more, for which he gave his notes on June 24th. The goods were invoiced and delivered to R., who placed them in the C. Co.'s store and in a warehouse he rented between June 20th and June 25th, and on June 23d and 24th he gave his checks upon the bank for $30,000 to the H. Co. and took its notes. R. and A. and the vice president of the bank testified that they did not suspect or have cause to believe at the time this transaction was completed that the H. Co. was insolvent, or that it was intended to prefer the bank or to hinder, delay, or defraud the creditors of the H. Co. thereby.

*Held,* the facts proved were insufficient to prove either that R. made the loan or that the bank received payments of its notes to prefer the bank to the other creditors of the H. Co., or to hinder or defraud them.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 303.\*]

**2. BANKRUPTCY (§ 166\*)—VOIDABLE PREFERENCE—INTENT OF DEBTOR.**

Proof of knowledge or notice of facts which give a creditor who obtains a preference reasonable cause to believe at the time he receives it

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied June 18, 1910.

that it is intended to prefer him to other creditors of his debtor thereby is indispensable to the establishment of a voidable preference.

Suspicion, fear, and facts that arouse suspicion and fear in the mind of the creditor, but give no reasonable ground for him to believe that the debtor intends a preference by his payment or security, do not make such a preference voidable.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.*]

3. BANKRUPTCY (§ 166*)—FRAUDULENT TRANSFER—INTENT TO DELAY OR DEFRAUD.

Actual fraud in which the recipient of the benefit of the transfer participates is indispensable to the avoidance of the transfer under sections 67e and 67d of the bankruptcy law (Act July 1, 1898, c. 541, 30 Stat. 564 [U. S. Comp. St. 1901, p. 3449]).

Liens created and securities given for a present consideration are valid (1) unless they actually hinder or defraud creditors, and (2) unless the grantee knew, or had reasonable notice when he took them, that they were intended to hinder or defraud the creditors of the grantor, or were made in contemplation of or in fraud of the bankruptcy law.

In the absence of such knowledge or notice, the fact that the liens or securities actually hinder creditors by withdrawing securities or property from application to the payment of their debts is insufficient to avoid them.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 166.*]

Adams, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Western District of Missouri.

Bill of John H Powell, trustee in bankruptcy of the John C. Humes Crockery Company, against the Gate City Bank and another. Decree of dismissal and complainant appeals. Affirmed.

James C. Williams, Ellison A. Neel, and A. S. Van Valkenburgh, for appellant.

John T. Harding and Thomas H. Reynolds (Lathrop, Morrow, Fox & Moore and McCune, Harding, Brown & Murphy, on the brief), for appellees.

Before SANBORN and ADAMS, Circuit Judges, and RINER, District Judge.

SANBORN, Circuit Judge. This is an appeal from a decree that the bill of John H. Powell, the trustee in bankruptcy of the estate of the John C. Humes Crockery Company, a corporation, against Gate City Bank, a corporation, and R. A. Clark, be dismissed. The bill was founded on the facts that between the 18th and 25th days of June, 1908, and within four months of the filing of a petition in bankruptcy against the Humes Company, R. A. Clark loaned to it, on the security of a part of its merchandise, $30,000, with which that company paid notes to the amount of $25,000 which it owed to the bank and a note of $5,000 that it owed to Burr & Co. in New York. The charge in the bill was that the Humes Company was insolvent, that R. A. Clark and the bank conspired to effect this loan and payment in order to prefer the bank to the other creditors of the Humes Company, and to hinder, delay and defraud its creditors. The insolvency of the company and the preference of the bank were clearly proved,

but the defendants denied (1) that they conspired together for this purpose; (2) that the loan was made or that the security was taken by R. A. Clark with the intent on his part to hinder, delay, or defraud the creditors of the Humes Company; and (3) that at the time of the payment the bank had reasonable cause to believe that it was intended to give it a preference thereby. In this state of the pleadings the burden was upon the trustee to prove the averments of the bill which were thus denied by clear and convincing evidence. The court below evidently found that he had failed to bear this burden successfully, for it dismissed the bill. The evidence upon the issues herein disputed is conflicting, and the finding and decree of the District Court must stand, unless the record clearly shows that an obvious error of law or some serious mistake of fact has been made by the chancellor in his findings or conclusions. Warren v. Burt, 7 C. C. A. 105, 110, 58 Fed. 101, 106; Coder v. Arts, 82 C. C. A. 91, 94, 152 Fed. 943, 946, 15 L. R. A. (N. S.) 372. The District Court committed no error of law for the law of this case was not and is not in controversy.

Although the payment to the bank effected a preference it was not voidable unless the bank had reasonable cause to believe that it was intended to give it a preference thereby. Act July 1, 1898, c. 541, §§ 60a, 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445); Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1905, p. 689; Supp. 1909, p. 1314).

The loan and the security were not voidable unless R. A. Clark knew or had reasonable notice that they were intended to hinder, delay, or defraud the creditors of the bank, or that they were made in contemplation of or in fraud upon the bankruptcy law. Liens accepted in good faith for a present consideration and not in contemplation of or in fraud upon that act are not affected thereby. Section 67d. The security given for a present loan is not avoided by the fact that it actually hinders or delays creditors by the withdrawal of the security from application to the payment of their claims unless it was given with an actual intent to defraud such creditors and the recipient had actual or legal notice of that purpose. Actual fraud in which the recipient of the lien or security participates is indispensable to the avoidance of a transaction of this nature. Coder v. Arts, 213 U. S. 223, 241–244, 29 Sup. Ct. 436, 53 L. Ed. 772; Id., 82 C. C. A. 91, 95, 152 Fed. 943, 947, 15 L. R. A. (N. S.) 372; Hiscock v. Varick Bank of New York, 206 U. S. 28, 41, 27 Sup. Ct. 681, 51 L. Ed. 945.

Three questions of fact, therefore, are presented for determination in this case and nothing more. Did R. A. Clark make the loan of $30,000 and take the security therefor with intent or with knowledge of an intent of the Humes Company to defraud any of its creditors, or to prefer the bank to its other creditors? Did the bank have reasonable cause to believe that the payment to it was intended to prefer it to the other creditors of the Humes Company? Did the bank and R. A. Clark conspire to make the loan and secure the payment for the purpose of preferring the bank and defrauding the other creditors of the Humes Company? The John C. Humes Crockery Company was a corporation engaged in the purchase and sale of china, crockery,

and silverware, and Humes was the owner of a large majority of its capital stock and the sole manager of all its business. In everything but legal effect he was the corporation. The capital stock of this corporation was $350,000 in 1904, when it was formed, and it had been increased to $500,000 in 1907. During the year 1908 until after the loan and payment in June, Bradstreet's Commercial Agency and Dun's Commercial Agency rated this corporation worth $300,000 to $500,000 above its liabilities, and both gave it the highest credit. Humes made a written statement March 16, 1908, that its assets above its liabilities were over $450,000, and J. J. Swofford & Co., of Kansas City, brokers selling its notes, estimated its assets in the same way, and published this estimate as a basis for its sales. The company was generally reputed to be prosperous and in excellent credit. Its standing was such that it had borrowed from and owed the National Bank of Commerce of Kansas City $75,000 in March, 1908, which it reduced to $65,000 in April, and it owed the Commercial Trust Company of that city $25,000. Nevertheless, this company was in fact insolvent. Its assets were worth probably from $110,000 to $150,000, while its liabilities were more than $200,000. But its actual condition appears to have been unknown to any one with whom it was dealing.

The Gate City Bank had a capital stock of $100,000, and was engaged in the business of banking in Kansas City, Mo. On April 23, 1908, Humes had been sued by one Richards for $100,000 for alienating the affections of the latter's wife. On April 24, 1908, the bank bought of note brokers two promissory notes of the Humes Company for $2,500 each, which were payable on July 6, 1908. On May 1, 1908, A. M. Clark, who is a brother of R. A. Clark, became the president of this bank. He had no previous experience in banking, and had been engaged in buying and selling real estate. On May 2, 1908, Humes was introduced to him by the attorney of the bank with the statement that he could rely upon anything Humes told him and that he was good for his contracts. Thereupon Humes gave A. M. Clark a written statement of the property of the Humes Company which disclosed net assets amounting to over $450,000. Clark, on behalf of the bank, then agreed to loan the Humes Company $20,000 on condition that it would pay back the money thus loaned whenever the bank called for it and that it would keep a deposit of $10,000 to its credit in the bank. Pursuant to this agreement the company borrowed $10,000 of the bank upon its note for that amount on May 11, 1908. On May 22d its credit balance was $2,683 and it borrowed $5,000 more. On June 6th it borrowed $5,000 more, and its credit balance became $9,947. On June 22d the company had a credit of $5,345.67. It drew $5,003.67, and the bank at its request wired this amount to New York in payment of a note of the company owing to Burr & Co. which was due in New York on that day. The bank then wrote the company to the effect that it was not carrying in the bank the balance to its credit agreed when it took its line of credit, that it was doing no business with the bank, that the bank was dissatisfied, and that it requested that its notes be taken up at an early date. On June 24, 1908, the Humes Company deposited with the bank $30,000 which

were the proceeds of the loan it had secured from R. A. Clark, caused the bank to wire $5,000 of this deposit to New York in payment of a note which it owed to Burr & Co. which was due on that day, and with the balance to its credit paid its notes which the bank held, including the two notes the company had bought in April, amounting in all to $25,000.

R. A. Clark was a successful merchant at Kansas City where he was conducting the business of the Clark Brothers Cutlery Company, a corporation organized in 1897 with a capital stock of $10,000, one half of which, with the exception of one share, was owned by him and the other half by A. M. Clark. In 1908, this corporation had net assets exceeding $100,000, and was making a profit of $15,000 per annum in its business. R. A. Clark managed the business of this corporation alone, and A. M. Clark gave it no considerable attention. On June 22, 1908, the bank held R. A. Clark's note for $8,000, which was a renewal of one made by him before A. M. Clark became president of the bank. He had on deposit to his credit more than $16,000. He and Humes were well acquainted with each other, and had talked over their respective lines of business at various times within the three years preceding. R. A. Clark had considered adding to his cutlery a line of china and crockery which he thought might be sold by the traveling men of his company without great additional expense, and in 1907 he had gone so far as to make out a list of goods of this class. About June 20, 1908, Humes went to him, told him his company had a lot of imported china worth about $25,000, that it would sell at its cost in Europe free from the cost of importation, and Clark agreed to buy it. A day or two after they agreed that instead of a purchase Clark should loan the Humes Company $25,000, take the crockery as security for the loan, and sell it, with the privilege of returning any of it that he found unsalable, on condition that the amount so returned should be credited at cost on the Humes Company's note. On June 23d at Humes' request, they agreed that the loan and the security should be increased $5,000. Between June 20th and June 24th, the china and crockery securing the notes of the company to R. A. Clark were delivered to him, and on or before June 24th the silverware which formed a part of this security was also delivered. Clark placed a portion of this property in the store of the cutlery company, and a portion of it in a warehouse which he rented from one Holcker. On June 23d the Humes Company gave its collateral demand note for $25,000 to Clark, and he gave it his check on the bank for that amount. On June 24th the company gave Clark its like note for $5,000, and he gave it his check for that amount upon the bank. On June 21st R. A. Clark secured through his brother, A. M. Clark, a loan of $10,000, and on June 23d a loan of $5,000 from the bank, and he gave his notes to the bank for these loans on June 24th.

After the foregoing transactions had been closed, Humes had an interview with R. A. Clark on the afternoon of June 24th told him that, on account of the suit against him for alienation and its feared effect upon his business, he wanted to disconnect himself from his corporation and its operations and to go away for a time, told him that the

business was profitable, that it earned $60,000 a year, showed him a statement that the assets amounted to about $670,000 and the liabilities from $215,000 to $250,000, and offered to turn over to him stock of the company of the par value of $250,000, on condition that he would take the presidency of the corporation, manage it at a salary of $6,000 per annum, run it until its net assets reached $500,000, and then turn back to him stock of the par value of $125,000. Clark considered this proposition until the next day and then accepted it, and on June 26th took possession of the property of the corporation in the place of Humes who resigned his position as president. Four days after on June 29th he discovered that the available assets of the company were less than $125,000, and immediately notified the creditors and took an inventory. A petition in bankruptcy was filed on June 30, 1908, the present trustee was appointed receiver, and an adjudication in bankruptcy shortly followed.

The facts which have been recited are established by the record beyond dispute. But where may there be found in them any clear proof that R. A. Clark made his loan with intent or with knowledge of any intent on the part of Humes to defraud the creditors of the Humes Company, or to enable it to prefer the bank to its other creditors? The fact must be borne in mind that the question is what R. A. Clark intended or knew on June 24th and that what he knew or learned or did thereafter is unimportant unless it tends to show his knowledge and intent before he had parted with his money. He paid his own money for the loan, $16,000 that he already had on deposit and $14,000 that he borrowed of the bank, and the evidence is clear that while Humes told him and he supposed that he was getting goods which were invoiced to him at about $33,000 at cost, the fact was that they were billed to him at 20 per cent. above cost, so that the company received from him more than the value of the goods it transferred to secure its notes, and neither the corporation nor its creditors could have been actually defrauded by the loan. The record has been searched in vain for any evidence that R. A. Clark had any notice or knowledge before he parted with his money that the Humes Company was insolvent or in financial difficulties, or that it was indebted to the Gate City Bank. It was generally reputed to be worth at least $250,-000 above its liabilities. Swofford & Co., the note brokers at Kansas City, sold one of its notes for $5,000 on June 24th, and if R. A. Clark did not know that the company was in financial trouble or that it owed the Gate City Bank he could not have conspired to enable the company to prefer it. Counsel have pointed out 26 circumstances that they contend are suspicious, such as that he did not have sufficient money of his own to consummate this transaction without borrowing the $15,000, that he took nearly one-half of the goods of the company although the fact was that he did not take one-third of its stock, and if Humes' statements, upon which he had a right to rely, had been true, he would have secured less than one-eighteenth of it. The other 24 circumstances which counsel dwell upon might be recited, but no good purpose would be served by discussing them. It is sufficient to say that each one of them has been carefully examined and con-

sidered, but in the light of the high financial repute of the Humes Company, of the actual advance by R. A. Clark of more than the full value of the goods he obtained, of his positive testimony that he knew nothing of the company's debt to the bank or of its insolvency, or of its financial straits, they have proved insufficient to overcome the legal presumption of honesty and good faith and the finding of the chancellor below in support of it.

We turn to the question whether or not the bank had reasonable cause to believe that it was intended to give it a preference over other creditors on June 24th, by the payment then made to it. Here, again, many circumstances are called to our attention to persuade to a finding that the bank had such cause. It made its last loan to the Humes Company on June 6th, and it was $5,000. That loan is conclusive evidence that the bank did not then believe that the company was insolvent or in danger of insolvency. A. M. Clark, its president, and Mr. Reed, its vice president, testified that they neither knew nor had cause to believe, and that they did not believe at the time the payment was made, that it was intended thereby to work a preference of the bank over the other creditors of the Humes Company, and that it was not until June 29th, when R. A. Clark informed them, that they discovered the insolvency of that corporation. Where is the proof to the contrary? Counsel answer, in the fact that the notes for the loan were 90-day notes, and were paid long before they were due, and in many other facts to which they point as suspicious circumstances. But the evidence is conflicting upon the question whether the three notes taken by the bank for the $20,000 were demand or time notes. Three notes payable on demand were produced from the custody of Mrs. Humes, which the president and the cashier of the bank testified were the identical notes given by the Humes Company for these $20,000. These witnesses could not have been deceived because the notes undoubtedly bore marks which indicated to them whether or not they had been through their bank, and they must have committed perjury and some one must have made false notes and presented them to the court below as the genuine ones, or the notes taken by the bank were payable on demand. The evidence that they were not demand notes is the admitted facts that each of the notes was discounted for 90 days, and that all the entries on the books of the bank and on the books of the Humes Company show these notes to have been payable in 90 days from their respective dates. But the testimony indicates that none of the entries in these books was made by any one from the notes themselves, that all these entries were made from statements which disclosed the fact that the notes had been discounted for 90 days, that in truth they were discounted for 90 days, but were made payable on demand pursuant to the original agreement between A. M. Clark and Humes that the Humes Company should have a line of credit of $20,000, subject to call at any time. This condition of the evidence leaves the issue whether these were demand or time notes doubtful. It is not of that clear and convincing character requisite to establish fraud, to overcome the finding of the court below, and to satisfy the mind that the notes taken by the bank were not the de-

mand notes presented at the hearing. Counsel for the trustee urge that A. M. Clark knew that the Humes Company had failed to keep a balance of $10,000 to its credit as it agreed, that the bank had wired money to New York on June 22d and June 24th to pay notes of the company, that the bank knew that the payment of June 24th was made with money derived from the loan made by R. A. Clark, and that he had taken goods of the Humes Company as security, a part of which he had put in a warehouse which A. M. Clark had inquired for as early as June 23d, and that late on June 24th, A. M. Clark was in the private office of the Humes Company hastening the delivery of the goods to his brother. The last fact alleged is not, however, established by the evidence. It rests on the testimony of two witnesses, one of whom testified that she saw A. M. Clark go into the private office, and the other that he did not see him, but that he heard his voice in that office. It is denied positively by three witnesses who, the witnesses for the complainant admitted, were present in the private office at the time they claim that A. M. Clark was present. The other facts pressed upon our attention are not so inconsistent with the conclusion that the bank was ignorant of the insolvency of the Humes Company, and that it had no reasonable cause to believe that it was intended to give it a preference by the payment to it as to overcome the presumption of good faith, the natural deduction from the good financial reputation of the company, and the positive testimony of the officers of the bank. The fact that the Humes Company was paying its notes for $10,000 to another creditor, $5,000 on June 22d and $5,000 more on June 24th, through this bank, rather indicated that the Humes Company was intending to pay all its creditors than that it was intending to give the bank any preference over others. The evidence in this case is voluminous, and it has not been practicable to recite the less material parts of it. But the more important and substantial portions of the testimony have been considered and discussed. It is true that fraud does not publish itself, and that proof of it must be drawn from acts, admissions, and circumstances. Nevertheless, it may not be established by suspicion alone; it must be proved by clear and convincing evidence of convicting facts and circumstances. There is no transaction so free from dishonesty that the imagination and ingenuity of a mind which searches for them may not find facts and circumstances surrounding it to arouse suspicions it seeks to foster. There are circumstances about the loan and the payment in this case that tend to raise a suspicion that the Clarks conspired to make them to prefer the bank. Yet all these circumstances and facts are not inconsistent with independent and separate action by each of them, and the legal presumption of honesty and good faith and the finding below sustain the latter theory. These men did not agree together to make this loan and payment unless they either knew or suspected the insolvency of the Humes Company, and that the loan and the payment were intended to prefer the bank to the other creditors of that corporation. The Humes Company was not insolvent unless the aggregate of its property was not at a fair valuation sufficient in amount to pay its debts. Section 1 (15). Suspicion, fear, and facts which

arouse suspicion and fear that the debtor is insolvent and intends to prefer a creditor, in the absence of notice or knowledge of facts that give such a creditor reasonable cause to believe the insolvency or the intended preference are insufficient to avoid the latter. Speaking of the proof that a creditor had reasonable cause to believe that his debtor was insolvent, Mr. Justice Bradley said, in Grant v. National Bank, 97 U. S. 80, 81, 24 L. Ed. 971:

"It is not enough that a creditor has some cause to suspect the insolvency of his debtor; but he must have such a knowledge of facts as to induce a reasonable belief of his debtor's insolvency, in order to invalidate a security taken for his debt. To make mere suspicion a ground of nullity in such a case would render the business transactions of the community altogether too insecure. It was never the intention of the framers of the act to establish any such rule. A man may have many grounds of suspicion that his debtor is in failing circumstances, and yet have no cause for a well-grounded belief of the fact. He may be unwilling to trust him further; he may feel anxious about his claim, and have a strong desire to secure it, and yet such belief as the act requires may be wanting. Obtaining additional security, or receiving payment of a debt, under such circumstances is not prohibited by the law. Receiving payment is put in the same category, in the section referred to, as receiving security. Hundreds of men constantly continue to make payments up to the very eve of their failure, which it would be very unjust and disastrous to set aside. And yet this could be done in a large proportion of cases if mere grounds of suspicion of their insolvency were sufficient for the purpose. The debtor is often buoyed up by the hope of being able to get through with his difficulties long after his case is in fact desperate; and his creditors, if they know anything of his embarrassments, either participate in the same feeling, or at least are willing to think that there is a possibility of his succeeding. To overhaul and set aside all his transactions with his creditors, made under such circumstances, because there may exist some grounds of suspicion of his inability to carry himself through, would make the bankrupt law an engine of oppression and injustice. It would, in fact, have the effect of producing bankruptcy in many cases where it might otherwise be avoided. Hence the act, very wisely, as we think, instead of making a payment or a security void for a mere suspicion of the debtor's insolvency, requires, for that purpose, that his creditor should have some reasonable cause to believe him insolvent. He must have a knowledge of some fact or facts calculated to produce such a belief in the mind of an ordinarily intelligent man."

To the same effect was the opinion of Mr. Justice Miller, in Stucky v. Masonic Savings Bank, 108 U. S. 74, 75, 2 Sup. Ct. 219, 220 (27 L. Ed. 640), where, referring to the Grant Case, he said:

"That case establishes the doctrine that a creditor dealing with a debtor whom he may suspect to be in failing circumstances, but of which he has no sufficient evidence, may receive payment or security without violating the bankrupt law. He may be unwilling to trust him further; he may feel anxious about his claim and have a strong desire to secure it, yet such belief as the act requires may be wanting. Obtaining additional security or receiving payment of a debt under such circumstances is not prohibited by law."

These decisions apply with equal force to the measure of proof requisite under the present bankruptcy law to establish the fact that a creditor had reasonable cause to believe that a preference was intended by a payment made or a security given within four months of the filing of the petition in bankruptcy. In re Eggert, 98 Fed. 843; Id., 43 C. C. A. 1, 102 Fed. 735; In re Goodhile (D. C.) 130 Fed. 471, 475; Turner v. Fisher (D. C.) 133 Fed. 594, 595; Off v. Hakes, 142 Fed. 364, 365, 73 C. C. A. 464; In re Pfaffinger, 154 Fed. 523,

525. The evidence in this case fails to reach this measure of proof. It fails to show that either of the Clarks before the loan and payment were completed knew or had such notice as would have led a person of ordinary prudence in his circumstances to know that the Humes Company was insolvent, or that either of them then had notice or knowledge of such facts as would have given him or a person of ordinary prudence in his situation reasonable cause to believe that it was intended to prefer the bank by the payment that was made to it. The decree below must accordingly be affirmed.

And it is so ordered.

ADAMS, Circuit Judge (dissenting). I am unable to agree with the majority with respect to the claim against the Gate City Bank. To my mind the proof was clear and convincing that it had reasonable cause to believe on June 24th, when the Humes Company paid its notes, that the latter company was then insolvent, and that a preference was intended in its favor. Certain facts are incontrovertible. The Humes Company was then actually insolvent, and a preference was actually given to the bank. The only other fact requisite to constitute this a voidable preference within the meaning of section 60b of the bankruptcy act and to entitle the trustee to recover the amount thereof is that the bank must have had at the time reasonable cause to believe that the Humes Company intended to give a preference to it. I shall not attempt an analysis of the proof. It manifestly created grave suspicion in the minds of the majority touching the good faith of the bank, but I think it went further. It is not very material whether the notes held by the bank were on their face payable in 90 days as claimed by the trustee, or whether they were on their face payable on demand as claimed by the bank. The fact is unquestionable that they were discounted for 90 days. The bank collected the interest on them in advance for that period of time. It entered them in its books as payable at the expiration of 90 days only. I cannot avoid the conclusion that whatever, the writing said, the parties, both the Humes Company and the bank, actually understood that the notes were not to be paid until the expiration of 90 days after their several dates. That time had not expired as to any of the notes on June 24th. The sudden call for their payment contrary to the understanding indicates something to my mind. Intelligent people generally act with a motive and for a purpose, and this is particularly true I think with respect to bank officials. They are anxious to loan their money at profitable rates of interest to responsible parties; and to keep it loaned, up to the full permissible legal limit. They are also especially keen and quick to follow up suspicion which points to probable loss. This, it is conceded, had been aroused in this case. With this condition of things as a background it is difficult to conceive why the Gate City Bank should have required the Humes Company to pay off a loan in advance of its actual maturity, especially so when it necessitated the refunding of money already collected by way of discount, unless it believed it would be dangerous to leave its money with the company longer.

It will avail nothing to discuss the testimony further. Suffice it to say that in my opinion all the facts and circumstances surrounding the payment of the money to the bank pointed strongly one way, and were entirely sufficient to lead an ordinarily prudent business man to conclude that a preference was intended. Such being the case, the bank under all the authorities had reasonable cause to believe the Humes Company intended to give it a preference by such payment.