## GLOBE & RUTGERS FIRE INS. CO. v. WINTER GARDEN CO. *

(Circuit Court of Appeals, Second Circuit. November 2, 1925.)

No. 15.

**I. Insurance ⬡➔603—Carriage of baggage and "props" in accordance with common custom, not violative of provision against releasing carrier from liability.**

Where theatrical company's baggage and "props" were in accordance with a general custom carried in special cars furnished by carrier, under contract whereby railroad was liable only for its own negligence and to specified amount, held, that insurance policy, providing that assured should not enter into any special agreement releasing common-law or statutory liability, was not violated.

**2. Insurance ⬡➔146(3)—Ambiguities in policy resolved against insurer, and to grant indemnity to assured.**

Any ambiguity in insurance policy is to be resolved against insurer, and the policy construed to grant indemnity to insured.

**3. Evidence ⬡➔66—Underwriters presumed to be acquainted with practice of trade they assure.**

Underwriters are presumed to be acquainted with the practice of the trade they assure.

**4. Evidence ⬡➔66—Insurer presumed to have knowledge of common usage theatrical company would follow in shipping baggage and "props."**

Company insuring theatrical company's goods in transit is presumed to have known theatrical company would follow common practice in shipping baggage and "props."

**5. Carriers ⬡➔397½—Carrier liable only for loss occasioned by its negligence, where passengers retain custody of own baggage.**

Where carrier assumes care and custody of baggage, it prima facie assumes liability of common carrier in respect thereto; but carrier is liable only for loss occasioned by its own negligence, if passengers retain custody of own baggage.

**6. Carriers ⬡➔397½—Carrier liable for negligence only where theatrical company retained control of own baggage.**

Where theatrical company was furnished baggage cars for baggage and "props," and had charge of loading and unloading and custody of the baggage, the railroad was liable for losses occasioned by its own negligence only.

**7. Damages ⬡➔113—Reasonable original cost, less depreciation, proper method of ascertaining damage to theatrical property.**

In ascertaining damages to insured theatrical baggage and "props," which had no general market value, the proper method was to ascertain reasonable original cost, less depreciation.

**8. Trial ⬡➔177—Where both parties moved for directed verdict, they affirmed there was no controlling question of fact.**

Where both parties moved for a directed verdict, they both affirmed that there was in

*Certiorari denied 46 S. Ct. 352, 70 L. Ed. —.

the record no disputed question of fact that could control the question of law presented.

**9. Appeal and error ⬡➔882(1)—Defendant, refusing to go before auditor appointed to determine damages, in no position to complain.**

Where both parties moved for directed verdict, and court appointed auditor to determine damages, it was not competent for parties to agree on figure, subject to whatever error might be discovered, and defendant, having refused to go before auditor, was in no position to complain of evidence tentatively taken in arriving at such figure.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Winter Garden Company against the Globe & Rutgers Fire Insurance Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Writ of error to judgment on a verdict directed by the District Court for the Southern District of New York in favor of plaintiff below (hereinafter called Garden Company) against defendant below (hereinafter called Insurance Company) in an action on a policy of insurance.

The Garden Company was the proprietor of a play (The Passing Show of 1921), which it exhibited in sundry cities of the United States and Canada. The production of this play required the services of upwards of a hundred people and the carriage of theatrical properties that filled three baggage cars.

On December 20, 1920, Insurance Company, upon receipt of due consideration, issued to Garden Company a policy of insurance in what was denominated in the caption of the policy the "theatrical form," a style of policy well known to and long used by proprietors of traveling plays and their insurers. This policy insured Garden Company "on scenery, costumes and theatrical properties of every description used in the production of" said play, and covered "loss or damage caused by fire, collision or derailment * * * while in transit by or in the custody of any railroad." The policy covered the enumerated risks of transportation "only within the limits of the United States and Canada." The further material extracts from the policy are as follows:

"It is understood and agreed that the assured may accept without prejudice to this insurance the ordinary bills of lading issued by carrier, but it is agreed that the assured shall not enter into any special agreement with the carrier releasing them from their common-law or statutory liability."

"In all cases of loss, the assured shall,

at the request of said assurer or its agents, assign and subrogate all their rights and claims against others to said assurer at time of payment to an amount not exceeding the sum paid by this company. This company is not liable for any loss which, without their consent, has been settled or compromised with others, who may be liable therefor."

"No suit or action on this policy for the recovery of any claim, shall be sustainable, in any court of law, or equity, until after full compliance by the assured with all the foregoing requirements, nor unless commenced within twelve months next after the loss."

During the life of the policy Garden Company moved its players and property from and to many cities. It was physically possible to transport the insured property by express or freight, a method, however, that would have made it impossible for the players and their theatrical paraphernalia to arrive in the city of their destination at the same time. Garden Company therefore followed a travel custom, fully proved as of long standing and well known, so well known that it has received practical recognition in the "tariffs" put forth under the authority of the Interstate Commerce Commission, and the Canadian regulations, also made under statutory authority, do not materially differ. By this tariff a form of contract is specifically prescribed which provides for the allowance of "special baggage cars" for the transportation of theatrical property accompanying a troupe, with values assigned to the property transported, much less than either the cost or market worth of articles of the kind used in and transported with the troupe presenting "The Passing Show of 1921." Under this contract it is possible to declare excess values by paying additional charges, but the contract was obligatory; it being provided that, "if the owner of the property is unwilling to execute the contract, he will be referred to the freight department [of the given railroad] or the express company."

In moving its properties and players during the life of the policy in suit, Garden Company habitually used this form of contract within the United States and did not declare excess value. It was proven that without using this form of contract, and so obtaining the use of baggage cars moving as fast as did the players, it would have been impossible to maintain the usual, well-known, and necessary rapidity of performance upon arrival at a new city. The use of special baggage cars in Canada was sim-

ilarly regulated, and in both countries the result of this method of doing business was that the transporting Railroad Company was liable only for the consequences of its own negligence, and then only (so far as baggage or theatrical properties were concerned) to the statutory or declared (as the case might be) value of the goods transported.

During the currency of the policy the Garden Company's players, their baggage and paraphernalia moved from Toronto to Montreal. During transit one of the three baggage cars, in which a portion of the insured property was placed, was found to be on fire, for reasons never discovered. It was not shown, nor suggested at trial, that the railroad was negligent. The fire consumed car and contents, whereupon the insured brought this action, laying its damages at nearly the amount of the policy.

Insurance Company asserted by answer that at the time of fire, and often before, the insured, in violation of the above-quoted portions of the policy, had "entered into special agreements with carriers" releasing them from their common-law and statutory liability, and at the time of loss the then transporting carrier was by such agreement released "from its common-law and statutory liability in regard to the goods, the loss of which" was the basis of action.

At trial the foregoing facts were shown, whereupon both parties moved for a directed verdict. The court below was of opinion that the insured had proved some loss payable under the policy, and had not been guilty of any breach of the contract of insurance, but as to the amount of Garden Company's recovery directed that the matter be heard by an auditor. Whereupon the parties agreed upon the "claimed sound value" and the "claimed loss" of the insured goods, and that on the basis of such value and loss the verdict for which plaintiff moved should be $89,886.84, together with interest.

But it was further stipulated that "this computation and stipulation is without prejudice to the [Insurance Company] and saves to [it] all possible objections to the character and sufficiency of the evidence, to the method of computation and to the standard of damages, and that it may and hereby does reserve its right to raise the incorrectness of the result as well as the incompetency of the evidence entering into that result, and the objections made upon the trial."

The Insurance Company having thus refused to take advantage of the opportunity offered of going before an auditor, the court

below directed judgment for the amount last above stated, together with interest, whereupon this writ was taken.

Davies, Auerbach & Cornell, of New York City (Martin A. Schenck and Murray C. Bernays, both of New York City, of counsel), for plaintiff in error.

Max D. Steuer, of New York City (William Klein and Samuel Gottlieb, both of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] Insurance Company's position at this bar is, virtually, that it was a violation of the above-quoted policy clauses for Garden Company to transport the insured property without obtaining from the acting carrier an assumption of liability such as is imposed on common carriers by tradition or statute, or at least what remains thereof over the lawful exceptions in such carriers' "ordinary" bill of lading. We cannot agree to this, and notwithstanding able argument for plaintiff in error, believe that Garden Company's right of recovery rests on simple propositions of law, after a plain reading of the policy language.

[2] It is urged with truth by defendant in error that, if there be any ambiguity in this contract, it is to be resolved contra proferentem, and that any policy of insurance should, if possible, be so construed as to grant indemnity to the assured. But it is not necessary to dwell upon these canons of construction.

[3] There is, however, another principle of insurance law that simplifies decision. It has never been better stated than by Lord Mansfield, in Noble v. Kennoway, 2 Doug. 510, viz. that "every underwriter is presumed to be acquainted with the practice of the trade he assures." Many citations amplifying and illustrating this proposition may be found in 14 R. C. L. p. 936, and 26 C. J. p. 78. We have heretofore recognized it in Globe, etc., Co. v. Moffat, 154 F. 13, 83 C. C. A. 91.

[4] Thus it may be assumed that, when this insurer issued the policy in suit, it did so with a presumed knowledge on its part, that Garden Company intended to do, in respect of transporting its property, exactly what it did do and long had done; also that every other theatrical troupe proprietor of any importance in North America had done and would do the same thing. If the policy be read in the light of the proven usage, it is

noticeable that "goods in transit" are covered. Disjunctively, goods "in the custody of any railroad" are covered—a phrase evidently intended to provide for periods of waiting for lading after delivery to a carrier, and for removal from terminal after unlading. But the transit during which the goods are covered is generally stated.

It is next observable that no obligation rests on the insured to ship in any particular manner; the goods might move by rail or by truck; indeed, we see nothing to exclude any form of transit on land. Further there is no obligation to ship under bills of lading. It is plain that, if the persons constituting Garden Company's troupe had taken their theatrical properties in their hands or on their backs into the cars which transported the men and women of the troupe, the policy would have attached.

[5] Doubtless, when a carrier assumes the care and custody of baggage, it prima facie assumes the liability of a common carrier in respect thereof. Hutch. Carriers, (3d Ed.) § 1241. But it is equally clear that, if passengers retain in their own custody their own baggage, to the exclusion of the carrier's control, the latter is liable only for losses occasioned by his own negligence. Id. § 1264.

[6] In our opinion this case presents the last legal situation. Garden Company bought so many passage tickets that the railroad furnished it three cars, upon which it loaded its own baggage and "props," and expected on arrival at destination to do its own unloading as well. The railroad had nothing to do with transport, except to haul the cars. In legal effect those entitled to travel on Garden Company's passage tickets took their baggage with them, in what for the time being were their own cars; they never handed over the insured property to the care or custody of the Railroad Company. Consequently the Railroad Company was liable for negligence alone; yet plainly this method of transportation was within the letter of the agreement made; that it was within the spirit thereof is shown by the custom now sufficiently alluded to.

Nor was there any obligation upon an insured that chose to carry his own baggage in his own car, just as if he were carrying it in his own hand, to pay for negligence liability on the part of the Railroad Company above and beyond the figures or values normally fixed by the tariff. There was no such obligation, because it is not specifically created by the policy, and what was done was in the trade insured usual and regular.

In sum, the policy nowhere requires the insured always to make some carrier responsible for the insured value so that the insurer may (theoretically) always have a second string to his bow. The insured need only abstain from making "special agreements" that release carriers from their normal liability; but there is no obligation,to choose that style of transport, which secures more than normal liability; having regard to the custom of the insured trade.

Much is made by plaintiff in error of cases such as Chicago, etc., Co. v. Wallace, 66 F. 506, 14 C. C. A. 257, 30 L. R. A. 161, which call contracts for transporting circuses and shows "special contracts." In one sense such agreements are special—i. e., not usual—because, as compared with the general run of transportation contracts, one for moving a troupe of any kind is rather rare or special. But in no sense was this an extraordinary, unusual or strange method of moving such a troupe as this with its property. It was indeed usual, common and almost universal long before this policy was written.

We conclude that plaintiff's method of transporting the insured goods from Toronto to Montreal was legally identical with going on board the train carrying the insured goods in its hand; it was the usual thing to do, and it was thoroughly customary. Therefore it was a lawful thing to do.

[7] There remains the method of assessing damages. Most of the insured property had been specially made for this play or a similar production. Such goods, can hardly be said to have a market value. Under the circumstances shown, we agree with the court below that the proper method of ascertaining damage was to discover the reasonable original cost less depreciation. The theory of proof was correct.

[8] As both parties moved for verdicts, both affirmed that there was in the record no disputed question of fact that could control the question of law presented. Fleischman Co. v. Irwin (C. C. A.) 5 F.(2d) 167. But the trial judge was unwilling, or unable, to go into the minutiae of proof along the lines indicated, so he designated an auditor and continued the trial.

[9] After this reasonable exercise of discretion, it was not competent for the parties to agree upon a figure,.subject to whatever error might be discovered in arriving thereat. This would be an easy method of manufacturing error; for we are substantially asked to examine the evidence tentatively taken, but sent to an auditor, in order to ascertain whether technical error was committed in tentatively admitting that upon which the trial judge refused to pass. We think such practice impossible, and hold that plaintiff in error, after having moved for a verdict and then refused to go before the auditor, is not in a position to complain of the evidence tentatively taken.

Judgment affirmed, with costs.